**Theresa STIEBERGER, et al., individually and on behalf of all persons similarly situated; and The City of New York, Plaintiffs,**

**v.**

**Louis W. SULLIVAN, as Secretary of Health and Human Services, et al., Defendants.**

**No. 84 CIV 1302 (LBS).**

United States District Court, S.D. New York.

May 29, 1990.

Legal Services for the Elderly, New York City (David S. Udell, Jonathan Weiss, of counsel), The Legal Aid Soc., New York City (Kalman Finkel, Helaine Barnett, Matthew Diller, of counsel), Burt Neuborne,

Nancy Morawetz, M.F.Y. Legal Services, New York City (Wayne G. Hawley, of counsel), for plaintiffs and the plaintiff class.

Victor A. Kovner, Corp. Counsel, New York City (Alice Morey, Asst. Corp. Counsel, of counsel), for the City of New York.

Stuart Gerson, Asst. Atty. Gen., Civil Div., Dept. of Justice, Washington, D.C. (Sheila Lieber, Brian G. Kennedy, Terry M. Henry, of counsel), for defendants.

## TABLE OF CONTENTS

I. BACKGROUND ....................................................... 722
 A. Procedural History of the Case ................................. 722
 B. The Administrative Review Process ............................. 723
II. DISCUSSION ....................................................... 724
 A. Statute of Limitations ........................................ 724
 B. Non-acquiescence .............................................. 728
 1. What Constitutes Non-acquiescence .......................... 728
 2. The Legality of Non-acquiescence ........................... 730
 3. Non-acquiescence in Second Circuit Precedent ............... 730
 a. Standing to Challenge Six Alleged Areas of Non-acquiescence ..... 731
 b. The Weight Accorded Treating Physician Opinions ............. 732
 c. The Right to Cross–Examine the Authors of Post–Hearing
 Reports ................................................. 738
 d. ALJ's Personal Observations ................................ 740
 e. The Standards for Evaluating Credibility ................... 742
 f. The Duty to Accord Weight to the Determinations of Other
 Agencies ............................................... 744
 g. The Duty to Assist Pro Se Claimants ....................... 745
 4. SSA's Formal Acquiescence Policy ........................... 747
 a. The Original Acquiescence Policy (Prior to June 1985) .......... 747
 b. The Adoption of Interim Circular 185 (June 1985–December
 1985) .................................................. 748
 c. Transmittal X–7 (December 1985– ) .......................... 750
 d. The Implementation of Interim Circular 185 and Transmittal
 X–7 ................................................... 751
 e. Measures Taken Since Transmittal X–7 ...................... 755
 f. Recent Amendments (January 1990– ) ........................ 757
III. CONCLUSION AND COMMENTS ON REMEDY ........................ 758

SAND, District Judge.

Plaintiffs, a class of Social Security claimants and the City of New York, bring this action challenging two policies of the Social Security Administration: "non-acquiescence" and "Bellmon Review." Plaintiffs move for summary judgment with respect to their non-acquiescence claim, and defendants, citing the applicable statute of limitations, move for judgment on the pleadings, or in the alternative for summary judgment, with respect to the City of New York and a substantial portion of the plaintiff class. Some familiarity with this Court's earlier decision in this case is presumed. *See Stieberger v. Heckler*, 615 F.Supp. 1315 (S.D.N.Y.1985), *vacated*, 801 F.2d 29 (2d Cir.1986).

## I. *Background*

### A. Procedural History of the Case

This Court's prior decision provides a detailed description of the early procedural history of this case which will only be briefly summarized here. *See Stieberger,* 615 F.Supp. at 1321–23. Plaintiffs Theresa Stieberger and the City of New York commenced this action to challenge two policies implemented by the United States Department of Health and Human Services ("HHS") and the Social Security Administration ("SSA"): "non-acquiescence" and "Bellmon Review." "Non-acquiescence" is the agency's alleged policy of adjudicating claims without implementing the holdings in decisions of United States Courts of Appeal. Bellmon review is the agency's policy pursuant to which the decisions of Administrative Law Judges ("ALJs"), who had rendered a high percentage of pro-claimant determinations in disability benefit cases, were subjected to agency-initiated review. Plaintiffs are moving for full summary judgment but are addressing only the non-acquiescence issue on the theory that they would be entitled to the same relief if they prevailed on one or both issues. Transcript of Oral Argument dated January 11, 1990 ("Tr.") at 12.

In this Court's decision of August 19, 1985, we denied defendants' motion to remand plaintiff Stieberger's case to SSA, granted plaintiff Patricia Happy's motion to intervene, denied a motion by Angel Vega to intervene, granted the motions of plaintiffs Milagros Sullivan and Harold Johnson to consolidate their actions with this action, and certified a class consisting of:

> All New York State residents whose claims for benefits or continuation of benefits have been or will be denied or terminated pursuant to hearings before administrative law judges since October 1, 1981, based on a determination that they do not have a disability that prevents them from engaging in substantial gainful activity; and whose benefits have

not been granted or restored through subsequent appeals.

615 F.Supp. at 1400. On the basis of a finding that plaintiffs were likely to prevail on the merits of their non-acquiescence claim, the Court granted a detailed preliminary injunction. The Court also found that plaintiffs had standing to challenge the Bellmon Review policy, but denied plaintiffs' motion for preliminary relief because SSA had discontinued the challenged aspects of the practice.[1] On September 6, 1986, the Second Circuit vacated this Court's preliminary injunction on the ground that the relief granted in *Schisler v. Heckler,* 787 F.2d 76 (2d Cir.1986) ("*Schisler I*"), had removed the necessity for this Court's injunction. *Stieberger v. Bowen,* 801 F.2d 29 (2d Cir.1986). In *Schisler I,* the Second Circuit directed the District Court on remand to "state in relevant publications to be determined by the district court that adjudicators at all levels, state and federal, are to apply the treating physician rule of this circuit." 787 F.2d at 84. The final *Schisler* instructions were eventually set out in *Schisler v. Bowen,* 851 F.2d 43, 46–47 (2d Cir.1988) ("*Schisler II*").

On January 26, 1987, this Court granted plaintiffs motion to compel production of documents relating to the work of the Litigation Management Project and the Acquiescence Task Force. With plaintiffs' agreement, a protective order was issued prohibiting the disclosure of the contents of the documents to others. On January 11, 1990, this Court lifted the protective order, Tr. at 47, and on February 8, 1990, the Court of Appeals denied defendants' petition for a stay of the order lifting the protective order.

In 1986, defendants moved for summary judgment on statute of limitations grounds with respect to the City of New York and a portion of the plaintiff class. This Court determined that a decision on defendants' motion should be deferred until a dispositive motion on the merits was also before

---

**1.** The Court had referred the motions for class certification and for a preliminary injunction to Magistrate Naomi Reice Buchwald for a report and recommendation. The Magistrate issued her report and recommendation on May 8, 1985.

the Court. Defendants have now renewed their motion, and it is presently before the Court.

### B. The Administrative Review Process

The Social Security Administration is responsible for administering the disability programs of the Social Security Act. SSA has set up a multi-step process for claimants seeking a determination that they are sufficiently disabled to be entitled to benefits. State disability determination services ("DDSs") make the initial determination relying upon a review physician or psychologist and a disability examiner neither of whom actually examine claimants. This determination is based upon a written record. In New York, the New York State Office of Disability Determinations ("ODD") performs this function pursuant to a contract with SSA. Under 42 U.S.C.A. § 421(a)(2) (1983 & Supp.1989) and 20 C.F.R. §§ 404.1615(a), 404.1633(a) & (b), 416.1015(a), 416.1033(a) & (b) (1989), ODD is bound to apply SSA's standards and procedures for determining disability. Within 60 days of the receipt of a denial notice, a claimant may seek reconsideration by ODD. Except when a claimant is seeking reconsideration of a determination that he is no longer disabled, reconsideration determinations are also made without a hearing or an appearance by the claimant.

SSA uses a set of instructions known as the Program Operations Manual System ("POMS") to instruct ODD adjudicators how to apply policies relating to the disability program. A procedure called "quality assurance" is used by SSA to monitor and evaluate ODD's compliance with SSA policy. Specifically, SSA officials review a percentage of ODD's disability determinations. When quality assurance staff members determine that ODD has deviated from SSA policy in a particular case, SSA may return the case to ODD for correction or further development of evidence. A percentage of "performance accuracy" is recorded by SSA, and if the percentage falls below a fixed level for two or more quarters, SSA is authorized to intervene to undertake certain corrective measures. If SSA declares ODD to be in a state of "substantial fail-ure," which can occur only after a number of alternatives have been exhausted, it can assume direct control of disability determinations. SSA also monitors and evaluates DDS's compliance with SSA policies and procedures during pre-effectuation review, a process through which SSA is required to review 65 percent of the favorable Title II disability determinations on a pre-effectuation basis.

Within 60 days of the receipt of a notice of denial at the reconsideration stage, a claimant may request a *de novo* hearing before an ALJ which is conducted by SSA's Office of Hearings and Appeals ("OHA"). At such a hearing, a claimant may appear and be represented, present witnesses, and present evidence of disability not presented to ODD. The ALJ may solicit the testimony of a physician, who reviews the documentary medical evidence and explains terms and concepts which appear in the records, and a vocational expert, who offers an opinion concerning whether a hypothetical claimant with certain mental and physical limitations would be capable of performing jobs in the national economy. The ALJ then issues a written decision.

The ALJ's decision may be appealed within 60 days to SSA's Appeals Council. The Appeals Council can also review on its own motion an ALJ decision for which the claimant has not sought review. The Appeals Council may deny or dismiss a request for review, or grant the request and issue a decision or remand the case for further proceedings. The Appeals Council will "consider all the evidence in the [ALJ] hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.976(b)(1), 416.-1476(b)(1) (1989).

Social Security Rulings ("SSRs"), which are issued by SSA, explain policies set out in the Social Security Act, regulations, and case law. SSRs present the agency's interpretation of the law, often incorporating decisions of federal courts, but do not have the force and effect of law. Unlike SSA regulations, SSRs were not published in

full in the Federal Register and did not appear in the Code of Federal Regulations, though regulations which became effective January 11, 1990 indicate that all SSRs will now be published in the Federal Register. 55 Fed.Reg. 1012, 1016 (1990) (to be codified at 20 C.F.R. 404, 410, 416, 422). When SSA issues a ruling acquiescing in a decision of a United States Court of Appeals, it is called an acquiescence ruling ("AR").

In addition to SSRs, decision-makers at the OHA level are provided with decisions of the United States Supreme Court and the OHA Handbook, a manual which guides OHA personnel on operating procedures.[2] Some decisions of the United States Courts of Appeal have been distributed to federal adjudicators by the Chief ALJ and Regional Chief ALJs, and federal adjudicators apparently have some access to other decisions through commercial reporters. Anderson Declaration ¶ 1. Since 1988, they have also been given the Circuit Court Case Reporter, an on-line data base which is part of the Hearings and Appeals Law (LEX) ("HALLEX").[3] Finally, SSA reports that "program circulars" which remind adjudicators of agency policy are distributed.

Upon denial of review by the Appeals Council or upon affirmance of the ALJ's decision by the Appeals Council, the claimant may file a complaint in federal district court challenging the agency's decision.

## II. *Discussion*

Fed.R.Civ.P. 56(c) stipulates that a motion for summary judgment shall be granted if there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Since the record before the Court consists almost entirely of undisputed facts, such as statements of SSA policy, internal agency memoranda the authenticity of which is unchallenged, and uncontradicted deposition testimony, we find that summary judgment is an appropriate mechanism for resolving the issues before the court. The few contested facts clearly do not relate to material issues.

## A. Statute of Limitations

■ Defendants move for judgment on the pleadings or in the alternative for summary judgment with respect to the City of New York, all unnamed class members in whose case a final decision was rendered before May 30, 1984, and all unnamed class members in whose case a non-final agency decision from which no appeal was taken was rendered before May 30, 1984. Defendants contend that because plaintiffs failed to comply with the requirement in 42 U.S.C.A. § 405(g) (1983) that judicial review of a final decision of the Secretary be sought within sixty days after the mailing of notice of the decision, their actions are barred.[4] Plaintiffs' amended complaint, which for the first time included claims relating to non-acquiescence and Bellmon Review, was filed on August 3, 1984.

Plaintiffs argue that this Court has already considered this issue in *Stieberger* and that this earlier decision should stand as the law of the case. Plaintiffs also reassert their argument that SSA has waived the statute of limitations and that equitable tolling of the statute is in order.

In *Stieberger* this Court granted plaintiffs' motion for certification of a class that included members of the class against whom defendants now seek summary judgment. In reaching our decision, we held that the sixty day period in Section 405(g) should be tolled because plaintiffs "had little basis to know, or reason to suspect, that the Secretary was refusing to apply the relevant precedents of judicial authorities in resolving their claims." 615 F.Supp.

**2.** SSA indicates that OHA is in the process of replacing the OHA Handbook with HALLEX. Defendants' 3(g) Statement ¶ 36.

**3.** For a description of the Reporter, *see infra* p. 756.

**4.** Section 405(g) provides in pertinent part that:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such determination by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow ...

at 1331. This Court discounted the importance of defendants' observation that SSA's policy was published in the Office of Hearings and Appeals ("OHA") Handbook, finding such publication more analogous to an internal memorandum. We concluded that:

> [t]he only manner in which the policy could have been detected is by a careful comparison of the Secretary's rules and the relevant case law; but surely the claimants 'were entitled to believe that their Government's determination of ineligibility was the considered judgment of an agency faithfully executing the laws of the United States' ... rather than the judgment of an agency which refused to adhere to Second Circuit precedent construing the Social Security Act.

*Id.* at 1331–32 (citations omitted).

■ Under the law of the case doctrine, a prior ruling on an issue of law in the same case will stand, absent "compelling" or "cogent" reasons for reconsideration. *Baden v. Koch,* 799 F.2d 825, 828 (2d Cir.1986); *Doe v. New York City Dep't of Social Servs.,* 709 F.2d 782, 789 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). Though the issue is presented to the Court in a different posture, we are asked to decide once again whether the actions of these plaintiffs should be barred by the 60–day limitation period in Section 405(g). However, since the Court's earlier ruling was based at least in part upon factual determinations, and since these determinations were made at a preliminary stage in this litigation before full discovery had taken place, the Court will revisit this issue in light of the expanded record now before it.

■ Defendants argue once again that their conduct with respect to non-acquiescence was not secretive.[5] However, the Court finds no reason to deviate from its ruling that the plaintiffs in this case had "little basis to know, or reason to suspect,

that the Secretary was refusing to apply the relevant precedents of judicial authorities in resolving their claims." 615 F.Supp. at 1331. Clearly, no attempt was ever made to apprise plaintiffs of SSA's actual policy toward decisions of the courts of appeal. We also find there to be sufficient evidence that SSA has persistently dismissed as insignificant and even attempted to obfuscate the discrepancies between the law of the Second Circuit and SSA policy. For example, the evidence suggests that SSA had offered its adjudicators through SSRs, POMS instructions for state adjudicators and training materials a number of methods to discount the opinions of treating physicians and had never instructed them how much weight such opinions should be given, despite a clear rule in the Second Circuit that such opinions are binding unless contradicted by substantial evidence. *See infra* pp. 732–38. SSA, for its part, has never acknowledged that it is bound by Second Circuit law generally or issued a ruling acquiescing in the treating physician rule specifically until ordered to do so by the Court of Appeals. Instead, it continues to argue that its own rules are not inconsistent with Second Circuit law. Under circumstances such as these, plaintiffs could not be expected to know of SSA's violations.

■ The Court also finds that defendants have offered no additional evidence which would lead the Court to deviate from its ruling in *Stieberger* that defendants' conduct with respect to the implementation of Bellmon Review warranted tolling of the sixty day limitations period. Defendants point out that a memorandum written in 1982 by defendant Louis B. Hays which described the individual ALJ portion of Bellmon review was not restricted in its circulation to the agency as this Court believed at the time of *Stieberger,* but was in fact published by the National Association of Social Security Claimants' Representatives and was therefore accessible to plain-

---

5. Where the Government's secretive conduct prevents a plaintiff from discerning a violation of his rights, a statute of limitations will be tolled until the plaintiff has had a reasonable opportunity to learn the facts concerning the

cause of action. *Bowen v. City of New York,* 476 U.S. 467, 481–82, 106 S.Ct. 2022, 2030–31, 90 L.Ed.2d 462 (1986); *City of New York v. Heckler,* 742 F.2d 729, 738 (2d Cir.1984).

tiffs' counsel. For reasons which will be discussed below, the Court does not believe that knowledge that can be ascribed to certain counsel is sufficient to bar the actions of the entire plaintiff class in this case. Defendants also draw the Court's attention to proceedings before Congress and various articles and stories which appeared in the media. We concluded in *Stieberger*, however, that in light of SSA's failure to disclose its implementation of Bellmon Review in accordance with APA rulemaking procedures or in some other manner reasonably ascertainable by plaintiffs, this evidence was insufficient to avert the tolling of the entire statute of limitations. Defendants have not offered any additional evidence suggesting that class members could reasonably have been expected to have familiarized themselves with Bellmon Review.

The thrust of defendants' argument is that plaintiffs' counsel either knew or should have known of the facts which gave rise to plaintiffs' cause of action. Defendants point out that the various congressional hearings, media reports and legal actions raising these issues well before the filing of plaintiffs' complaint should have at least apprised counsel of the relevant facts. More significantly, defendants offer a letter from one of plaintiffs' attorneys which indicates that some time in the late fall of 1982 an attorney was assigned to determine whether hearings held by the Senate Subcommittee on Governmental Operations on May 10, 1982 "raised issues that were amenable to litigation." *See* Letter from Burt Neuborne to Brian Kennedy (May 19, 1986); Defendants' Exhibit ("DX") A. The letter also indicates that counsel prepared a draft complaint that became the basis for the complaint in this action as early as March 1983, sixteen months before this action was commenced. *Id.* This evidence would strongly suggest that some of plaintiffs' attorneys knew of the relevant facts well before May 30, 1984 and that many other attorneys could have known of them.

What follows from this conclusion, however, is not clear. Defendants cite *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962) (quoting *Smith v. Ayer*, 101 U.S. 320, 326, 25 L.Ed. 955 (1880)), for the proposition that plaintiffs are charged with " 'notice of all facts, notice of which can be charged upon the attorney.' " *See also Hay v. Wells Cargo, Inc.*, 596 F.Supp. 635, 640 (D.Nev. 1984), *aff'd*, 796 F.2d 478 (9th Cir.1985) (counsel's knowledge, imputed to plaintiff, can foreclose equitable tolling of statute of limitations); *International Paper Co. v. Federal Power Comm'n*, 438 F.2d 1349, 1357 (2d Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 61, 30 L.Ed.2d 56 (1971). Plaintiffs point out that each of the cases cited by defendants involved individual representation where plaintiffs had at least some discernible relationship with counsel and retained the option of commencing legal malpractice actions against their attorneys and did not involve a class action with thousands of dispersed parties. Plaintiffs also observe that class counsel in this case did not represent the class members prior to the commencement of this litigation.

It should be noted that other courts have considered tolling the statute of limitations of Section 405(g) in class actions challenging non-acquiescence, though none of these courts appears to have considered the impact of knowledge on the part of counsel of the facts giving rise to the cause of action more than 60 days before the action was commenced. *See Hyatt v. Heckler*, 807 F.2d 376, 380–81 (4th Cir.1986), *cert. denied*, 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987); *Lopez v. Heckler*, 725 F.2d 1489, 1504–07 (9th Cir.), *vacated on other grounds*, 469 U.S. 1082, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984); *Adamson v. Bowen*, 855 F.2d 668, 677 (10th Cir.1988); *Schisler v. Heckler*, 107 F.R.D. 609, 614 (W.D.N.Y. 1984).[6] One court has also tolled the 60–day period in an action challenging Bellmon review. *See W.C. v. Heckler*, 629 F.Supp. 791, 796 (W.D.Wash.1986), *aff'd*, 807 F.2d 1502 (9th Cir.1987). At the same time, though not in a case involving non-acqui-

---

**6.** *Cf. Beckless v. Heckler*, 622 F.Supp. 715, 719– 20 (N.D.Ill.1985).

escence or Bellmon review, at least one court has declined to toll the limitation period under Section 405(g) where the plaintiffs *or* counsel for the plaintiff class should have been aware of the facts which formed the basis for plaintiffs' cause of action more than 60 days before the filing of the complaint. *See Gay v. Bowen,* No. 87–0441, 1987 WL 15516 (N.D.Ill. Oct. 19, 1987) (WESTLAW, DCT file).

The Court's decision would have unfortunate consequences whether or not we find the statute of limitations to have been tolled. If we imputed counsel's knowledge to the entire plaintiff class, thousands of members of the class, many of whom are disabled, indigent, and unsophisticated pro se litigants, would be denied relief to which they would otherwise be entitled and may desperately need. Furthermore, the vast majority of·the class members have had no contact with counsel and may well be unaware that any action in which they have an interest is proceeding. At the same time, if counsel for a class is permitted to ignore limitations provisions like Section 405(g), there is a danger that the salutary purposes of a statute of limitations may be significantly undermined in class actions.

■ Tolling is an equitable concept and the Court must therefore strike a balance between the concerns underlying the statute of limitations and the equitable interest in not extinguishing otherwise valid complaints of unrepresented and unsophisticated persons. We hold that where a member of the plaintiff class was represented by counsel at the final stage of the administrative review process, and where counsel had knowledge of the facts which formed the basis for this action or it can be demonstrated that counsel had access to such knowledge, that member's claim will be barred by Section 405(g). For example, the claim of a member of the class, if any, represented by counsel Burt Neuborne at the final stage of the administrative review process would be barred. As part of any future remedy in this action, the Court will direct that the form providing notice to class members and soliciting dates as to eligibility for relief inquire whether that member was represented by counsel and the identity of such counsel.

■ Defendants, anticipating that the Court might reach this type of result, argue that "to the extent individual knowledge of the unnamed class members themselves [and presumably their counsel] were deemed material ... it would be doubtful in the extreme that class certification would remain appropriate." Defendants' Memorandum in Support of Motion for Judgment on the Pleadings at 20, n. 23.[7] However, the presence of unresolved individual issues of compliance with the statute of limitations does not prevent class actions from proceeding. *See, e.g., Milberg v. Lawrence Cedarhurst Fed. Sav. & Loan Ass'n.,* 68 F.R.D. 49, 52 (E.D.N.Y.1975); *Williams v. Sinclair,* 529 F.2d 1383, 1388 (9th Cir.1975), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976). If it is determined that individual members of the plaintiff class are barred by the statute of limitations as a result of knowledge attributed to their attorneys, the Court can enter the appropriate order stating that those persons are ineligible for relief. *See Cohen v. District of Columbia Nat'l Bank,* 59 F.R.D. 84 (D.D.C.1972). Since the plaintiff class by and large pursued its disability claims pro se, it is reasonable to assume that the class members who will thus be barred would constitute a small percentage of the tens of thousands of disability claimants.

Since the City of New York seeks no independent relief and no monetary damages, the Court need not address whether the City of New York is barred by the statute of limitations.

---

**7.** Defendants, citing *Moviecolor Ltd. v. Eastman Kodak Co.,* 288 F.2d 80, 88 (2d cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961), also argue that the burden of coming forward with evidence is on the plaintiffs. Plaintiffs have offered sufficient evidence of concealment by defendants to warrant tolling of the statute of limitations. *Moviecolor* does not require that a class complaint aver facts or that plaintiffs present evidence demonstrating that each member of the class and his counsel was unaware of the facts giving rise to the class's cause of action.

B. Non-acquiescence

1. *What Constitutes Non-acquiescence*

Our focus now turns to plaintiffs' motion for summary judgment with respect to their claim of SSA non-acquiescence. Non-acquiescence can be understood generally as an administrative agency's deliberate refusal to implement holdings in binding court decisions in cases adjudicated before it. *See Heckler v. Lopez,* 464 U.S. 879, 887, 104 S.Ct. 221, 226, 78 L.Ed.2d 217 (1983) (Brennan, J., dissenting). The type of non-acquiescence at issue in this case is SSA's unwillingness to follow a court of appeals holding in subsequent cases within the same circuit.[8] *See Stieberger,* 615 F.Supp. at 1342–43.

As at least one SSA official has recognized, the agency has practiced different types of non-acquiescence. At times it has formally announced that it will not apply holdings of courts of appeal, and at other times, it has simply ignored the decisions and "continue[ed] to follow the Secretary's interpretation as reflected in regulations or other agency instructions." PX 23 at 1; Wilson Deposition ("Dep.") II at 316–18. Plaintiffs suggest that the agency is now primarily practicing this form of "silent non-acquiescence."[9] Defendants deny that they have engaged in any form of non-acquiescence in disability cases, at least since 1985.

■■■ In order to establish agency non-acquiescence, the evidence must demonstrate that SSA has deliberately failed to "follow the law of the circuit whose courts have jurisdiction over the cause of action." *Hyatt v. Heckler,* 807 F.2d 376, 379 (4th Cir.1986), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987). In the ab-

sence of an instruction to apply court of appeals holdings to the cases before them, SSA adjudicators are obliged to apply agency policy and agency interpretations of the law. *Nash v. Bowen,* 869 F.2d 675, 680 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989). Since SSA has not instructed its adjudicators that they are bound by the decisions of the courts of appeal but has instead explicitly directed them to apply agency policy, a careful comparison between these decisions and agency policy must be undertaken.

■■■ Where the agency does not formally announce that it will non-acquiesce in a particular decision, the agency's conduct cannot be considered non-acquiescence unless there are substantial differences between agency policy and court of appeals holdings and unless these differences have influenced the agency's adjudication of individual cases. *See Floyd v. Sullivan,* 833 F.2d 529, 532 (5th Cir.1987) (differences in language do not constitute non-acquiescence; plaintiffs must offer evidence of a system-wide pattern of mistaken adjudication). If a particular difference between SSA policy and a court holding has not affected the agency's adjudication of individual cases, the agency cannot be said to have failed to apply the holding in practice, and the agency's conduct cannot be said to have affected the determinations of eligibility. Impact upon the adjudicatory process can be established with evidence of "a system-wide pattern of mistaken adjudication," *id.,* such as a series of cases where courts have reversed for failure to apply a particular holding or internal SSA memoranda describing a practice of not applying a particular holding.[10]

---

8. SSA acknowledges that it is bound by any Supreme Court decision.

9. *See* Estreicher & Revesz, *Nonacquiescence by Federal Administrative Agencies,* 98 Yale L.J. 679, 699 n. 94 (1989).

10. *See also Wilkerson v. Sullivan,* 727 F.Supp. 925 (E.D.Pa.1989) (after finding regulations inconsistent with holdings of the court of appeals and compelling evidence of a pattern of "nonacquiescence" including "long-line" of decisions by courts in the Third Circuit, court granted injunc-

tion ordering SSA to evaluate claims of alcoholics for social security benefits and supplemental security income payments under standard articulated in Third Circuit law); *Schisler I,* 787 F.2d at 83–84 (although accepting representations of SSA's counsel that agency policy was the same as the treating physician rule, court found injunctive relief appropriate in light of "historical record of [court] reversals involving this issue and the failure of SSA to inform its adjudicators of its true policy").

A small number of cases over a significant period of time where courts reversed for failure to apply a court of appeals holding would suggest either that the effects of the difference between agency policy and the holding cannot be detected in court opinions, that the differences have no effect, or that SSA actually applies the holding in the cases it adjudicates. Whatever the explanation, however, without other evidence of an impact upon the adjudicatory process the agency's practice could not be called non-acquiescence. On the other hand, if a rather large number of courts have found that SSA adjudicators failed to apply a particular holding, the difference between agency policy and the particular holding can be said to have influenced agency adjudication.

Unless the impact of the differences between SSA policy and court of appeals holdings upon the agency's adjudication of cases has come to the attention of SSA officials, the differences could still conceivably be explained as inadvertent or unintentional. However, if a number of courts have reversed or remanded cases because of an agency adjudicator's failure to apply a particular holding or if some group within SSA has called these differences to the attention of agency officials, the continued failure to reconcile agency policy with the holding can be considered deliberate.

■ SSA argues that it is acquiescing as long as it's policy is not explicitly inconsistent with the holdings in Second Circuit decisions. Stated differently, SSA maintains that it is failing to acquiesce only when a provision of SSA policy expressly contradicts a Second Circuit holding. If one accepts the legal premise that SSA is bound by the holdings of the courts of appeal, as this Court does, whether SSA's policy explicitly contradicts the holdings is not the issue. The issue is whether SSA is affirmatively applying the Court's holding and whether the consequence thereof is to deny claimants benefits to which they would otherwise be entitled.

■ Defendants also argue that because precedents can be read either broadly or narrowly, any duty they have to acquiesce does not extend beyond acquiescence in "cases of square conflict" between SSA policy and court decision. Defendants' Memorandum at 41–44. Defendants draw this conclusion from the principle that an agency is required to acquiesce only in "square holdings of courts."

Clearly, SSA is not obliged to incorporate dicta from court of appeals decisions as policy. *See Sirbo Holdings, Inc. v. Commissioner of IRS*, 476 F.2d 981, 989 (2d Cir.1973) (tax court fulfills its duties when it "respects *decisions* of a court of appeals ... and should be free to voice its disagreement with statements not essential thereto ..." (emphasis in original)); *Schisler II*, 851 F.2d at 46–47. Nor would SSA be expected to apply a holding from a Second Circuit decision beyond the scope indicated by the language of the decision itself. *See Dixon v. United States*, 381 U.S. 68, 76–79, 85 S.Ct. 1301, 1306–08, 14 L.Ed.2d 223 (1965). For example, if the wording of a Second Circuit holding could be read in good faith to suggest that the holding should apply only to the facts of that specific case, SSA would of course not be obligated to apply the holding beyond those facts.

Moreover, if the agency could find a principled distinction between a particular set of factual circumstances and the case in which the Second Circuit articulated its holding which would indicate that the decision would not be controlling under those circumstances, and if SSA believed in good faith that the decision should not be applied in those circumstances, it would be entitled to set out as policy both the circumstances where the decision would be controlling and the circumstances where SSA had decided that it should not be applied. Under this scenario, the Second Circuit would presumably have the opportunity, when reviewing a decision arising under these "different circumstances," to pass upon the distinction drawn by SSA. In addition, SSA's position with regard to the Second's Circuit's holding would be clearly articulated as policy.

It does not follow from any of this, however, that SSA has a duty to acquiesce only

when there is a "square conflict" between SSA policy and a court decisions. Where there are substantial differences between SSA policy and Second Circuit holdings and where these differences would influence the agency's adjudication of cases, SSA would be expected to acquiesce, except under certain narrowly defined circumstances. *See infra* note 11.

■■■■ Defendants argue that Court holdings concerning the "weight" given to evidence or requiring that an adjudicator "consider" certain factors are difficult to put into practice. Defendants' Memorandum at 76. If the Second Circuit's holdings suffer from any ambiguity or are difficult to implement, SSA is free to state the holdings as policy and then offer a good faith explanation in the same policy statement of how the rule will be put into practice. Should the Second Circuit regard SSA's explanation as inconsistent with how it intended the rule to operate, the Court will have the opportunity to indicate this upon review of individual cases. In the meantime, SSA could not be said to have failed to acquiesce.

### 2. *The Legality of Non-acquiescence*

■■■■■ In *Stieberger*, this court held that SSA's refusal to follow a court of appeals ruling in subsequent cases within the same circuit ran afoul of the doctrine of separation of powers in the United States Constitution. 615 F.Supp. at 1357. We find the same deficiencies where the agency is applying a substantially different rule which influences its adjudication of cases controlled by the court of appeals holdings.

After noting in *Stieberger* that plaintiffs were entitled to have the validity of SSA's policy and practice under the Constitution's Equal Protection Clause analyzed under the rational basis standard, we also found that:

[t]he consequence of the SSA's non-acquiescence policy is simply this: one set of rules applies to those claimants fortunate enough to procure legal representation, persistent enough to appeal an adverse determination of the various non-acquiescing levels of the agency to a federal court bound to follow the Court of Appeals ruling, and healthy enough to endure this belabored process; a different and adverse rule will govern the rights of those claimants who are unrepresented, insufficiently persistent in their efforts to invoke the benefits of favorable judicial rulings, or incapable of doing so. The arbitrariness of such as system is evident simply from its description.

*Id* at 1362–63. Based upon these observations, we concluded that the arbitrary distinctions drawn by SSA's policy were difficult to reconcile with constitutional due process and equal protection standards. *Id.*[11] Where SSA's rule is substantially different in a case controlled by a court of appeals decision and the agency's adjudication of cases is thereby affected, these same constitutional infirmities are present.

### 3. *Non-acquiescence in Second Circuit Precedent*

Plaintiffs are alleging that SSA's policies and practices amounted to non-acquiescence in five discrete areas: the weight accorded treating physician opinions, the right to cross-examine the authors of post-hearing reports, the standards for evaluating credibility, the duty to accord weight to the determinations of other agencies, and the duty to assist pro se claimants. For the sake of specificity, the Court has created a sixth category: an ALJ's consideration of his or her own personal observations. The Court will consider each area in turn to determine whether there are substantial differences between agency policy and Second Circuit holdings and whether

---

**11.** In *Stieberger*, we observed that where the passage of time accompanied by criticism and gradual erosion of a particular rule made it reasonably certain that reconsideration by the court of appeals would be forthcoming or where the agency had substantial reason to believe that subsequent consideration of the issue in other

fora had created conditions which made reconsideration by the court of appeals likely, intra-circuit non-acquiescence might be permissible. 615 F.Supp. at 1365–66. None of the alleged non-acquiescence by defendants in this action involves these circumstances.

these differences have affected SSA's adjudication of cases. Because plaintiffs contend that SSA's general acquiescence policy has in fact perpetuated systematic non-acquiescence and can be expected to continue to do so, the Court will also analyze that policy to determine whether it can be expected to guard sufficiently against non-acquiescence in the future.

■ To be entitled to the injunctive relief they seek, plaintiffs must demonstrate a "threat of continuing injury." *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1022 (2d Cir. 1989); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). Because plaintiffs seek readjudication of all administrative determinations rendered after October 1, 1981 denying the claims of class members for disability payments, *see* Plaintiffs' Suggested Remedial Order and Judgment ¶ 12 & 13, they must also demonstrate specific instances of agency non-acquiescence. Defendants maintain, as they did in opposition to plaintiffs' motion for a preliminary injunction, that the Court need not evaluate the legality of its general acquiescence policy because SSA's standards and policies are in conformity with Second Circuit holdings. We will therefore consider first whether plaintiffs have established the specific instances of past non-acquiescence they allege.

#### a. Standing to Challenge Six Alleged Areas of Non-acquiescence

■ Defendants contest the class representatives' standing to challenge alleged non-acquiescence by SSA in holdings other than the treating physician rule and the duty owed to pro se plaintiffs, pointing out that the named plaintiffs have not alleged that non-acquiescence in those other particular holdings injured them. While the issues raised by the named plaintiff in a class action are limited to those as to which he is aggrieved, *see Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir.1968), defendants' definition of the "issues" as to which plaintiffs are aggrieved is too narrow. It is apparent that plain-

tiffs' challenge is to SSA's general "policy and practice" of non-acquiescence in holdings of the Second Circuit. *See* Second Amended Complaint ¶¶ 1, 23–31. Plaintiffs clearly allege that they were injured as a result of this policy and practice. *Id.* at ¶ 36.

■ Defendants' argument can be recast as challenge to the typicality of the named plaintiffs' claims or the commonality of the class issues under Fed.R.Civ.P. 23(a). Under Rule 23(a), the claims of the class must be limited to "those fairly encompassed by the named plaintiffs' claims," *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980), and a class representative "must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974)). Generally, a named plaintiff's claim is typical if "it arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Paskel v. Heckler*, 99 F.R.D. 80 (E.D.Pa.1983) (quoting 1 H. Newberg, Class Actions § 1115b (1977)).

In *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598–99 (2d Cir.1986), the Second Circuit held that a named plaintiff who alleged a claim of discriminatory placement and discriminatory denial of transfer could serve as a representative of a class alleging discrimination in training or promotion, in part because the existence and functioning of a discriminatory system within a company was a common issue. Plaintiffs in this case also allege a systemic violation caused by the policy and practice of a single organization, and their respective injuries and legal theories are considerably more similar than those of the class in *Rossini*.

The class representatives in this case, like each member of the class, allegedly suffered precisely the same injury, *i.e.* the

denial of disability benefits. Each member of the class allegedly was injured as a result of the same administrative agency's policy and practice of not acquiescing in the holdings of the same United States Court of Appeals. Each class member's interest in the litigation is in having SSA apply holdings of the Second Circuit in adjudicating their claims. The only material difference among the claims of members of the class is the specific holding of the Second Circuit which was not applied to their individual cases. We find that the common issues among the class predominate and that the claims of the class representatives are typical of those of the class.

In order to adjudicate fully the claims of the class and issues defined in *Stieberger*, the Court must address whether SSA has acquiesced in these additional Second Circuit holdings. In *Stieberger* we found the commonality requirement of Fed.R.Civ.P. 23(b)(3) was satisfied by the class allegation that their disability claims were decided by adjudicators instructed by SSA to disregard circuit court precedent. 615 F.Supp. at 1327–28. We also certified a class consisting of New York residents whose benefit claims have been or will be denied or terminated pursuant to hearing before administrative law judges since October 1, 1981, based on a determination that they do not have a disability that prevents them from engaging in substantial gainful activity. *Id.* at 1400. Without evidence of the extent of SSA's non-acquiescence in Second Circuit holdings, plaintiffs would not be able to demonstrate the actual nature and extent of the injury inflicted upon the class by the challenged conduct. Similarly, without such evidence, the Court would be unable to tailor the class relief to the scope of defendants' violation. *See Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979). Plaintiffs have indicated a willingness and ability to join other class members falling in these other categories. The Court believes such an exercise would delay this already protracted litigation unnecessarily.

### b. The Weight Accorded Treating Physician Opinions

Plaintiffs argue that class members whose cases were adjudicated prior to the entry of the preliminary injunction in this case were denied the benefit of the Second Circuit's treating physician rule, unless they appealed to a federal court which perceived SSA's failure to apply the rule. Plaintiffs also contend that SSA would continue to adjudicate cases without following the Second Circuit rule if it were not for this case and the *Schisler* decision. In *Stieberger* we concluded:

The evidence of agency non-acquiescence in the Second Circuit's treating physician rule is overwhelming. One or two decisions reversing an ALJ's improper consideration of treating physician opinion testimony might be nothing more than the ordinary aberrations of the administrative agency adjudicative process. The striking pattern of consistent disregard for clear, repeatedly articulated standards is evidence of a wholly different character. Moreover, while the present record is not complete with full administrative records of plaintiffs' individual disability determinations, defendants have made no attempt to even begin to refute the assertions of non-acquiescence contained in the affidavits of the individual plaintiffs ... concerning the agency's blatant disregard of the Second Circuit's treating physician's rule.

Defendants may well be correct in observing that cases involving the opinion of a treating physician involve a panoply of different factual circumstances including, *inter alia*, the nature of the physician's opinion (*i.e.*, medical, vocational, or a "legal" opinion on the ultimate issue of disability); the length of the doctor/patient relationship; the physician's expertise in the subject matter of his or her opinion, or the consistency of a treating physician's opinion with that of another treating physician. We fail to see, however, how these variables in any way refute or explain the overwhelming evidence of the Secretary's persistent failure to apply the Second circuit's legal standards governing the evaluation of

the opinion of a claimant's treating physician. While the Secretary's non-acquiescence could arguably be even more explicit, such as in those situations in which the Secretary issues a formal statement of non-acquiescence, we believe that the preliminary showing here is virtually as strong a showing of *de facto* non-acquiescence as can be made.

615 F.Supp. at 1349.

In *Schisler I,* 787 F.2d 76 (2d Cir.1986), the Second Circuit directed Judge Elfvin to enter an order requiring SSA to instruct its adjudicators to adhere to the treating physician rule. In its decision, after noting both that the treating physician rule had never been the subject of a formal statement of non-acquiescence by SSA and that reversals based on this rule were so numerous as to justify plaintiffs' concerns, the Second Circuit accepted "at face value" the assertion by counsel for SSA that "the policy position of the Secretary ... is the same as the second circuit rule." *Id.* at 83–84. At the same time, the Court rejected SSA's argument that an injunction was inappropriate because of the difficulties in distinguishing an "innocent misapplication" from a "deliberate failure to apply the rule." *Id.* at 84. The Court found that "the great benefits to be gained by avoiding unnecessary delay to claimants and unnecessary review by the courts" outweighed the cost of properly instructing SSA adjudicators. *Id.*

SSA's proposed instruction submitted in November 1986 pursuant to the Second Circuit's decision in *Schisler I* set forth "factors" to be considered in determining "the consideration given to a particular medical report," including: the relationship between the individual and the source, the completeness of the medical report, the medical specialty of the source, the recentness of the evidence and the extent to which the opinion is supported by medical findings. Plaintiffs' Exhibit ("PX") 114 at 9–11. The proposed instruction also indicated that treating physician opinions would be "conclusive" as to the issues of the nature and severity of an impairment

only when they were "fully supported by medically acceptable clinical and/or laboratory diagnostic techniques." *Id.* Judge Elfvin found that "there lurk[ed] in [the proposed instruction's] lengthy and discursive text bases for not applying the treating physician rule." *Schisler,* No. 80–572E, 1987 WL 15330 (W.D.N.Y. August 5, 1987) (WESTLAW, DCT file) at n. 3. The instruction eventually ordered by the District Court was distributed on October 29, 1987. The Second Circuit appended a final version of the instruction to its decision in *Schisler II,* 851 F.2d at 46–47. SSA circulated copies of the instruction to OHA adjudicators in New York State on March 9, 1989 and to state adjudicators in New York on April 5, 1989. PX 119.

The preliminary injunction issued by this Court ordered SSA to distribute to adjudicators a writing stating the treating physician rule. After the Court of Appeals vacated the injunction, SSA issued two teletypes, the first announcing the Court of Appeals decision, PX 115, and the second stating "all existing memorandums, teletypes, instructions, and POMs issued in *Stieberger v. Bowen* will remain in effect until superseded by the issue of further instructions on treating source evidence." PX 116.[12] Since SSA was required to conform SSA policy to the treating physician rule pursuant to the *Stieberger* injunction and since SSA left the *Stieberger* instructions in place after the injunction was vacated, the Court confines its inquiry to whether non-acquiescence occurred before the date of compliance with *Stieberger.*

By comparing the treating physician rule as set out by decisions of the Second Circuit and the policy of SSA prior to the date of compliance with *Stieberger* as expounded in SSRs, POMS instructions and training materials, the Court must determine whether the representation by counsel in *Schisler I* that the policy position of SSA was the same as the Second Circuit rule was in fact accurate. Stated differently, the Court must decide whether its preliminary conclusion in *Stieberger* that SSA persistently failed to acquiesce in the Second

**12.** *But see* note 31.

Circuit's holdings governing the evaluation of the opinion of a claimant's treating physician is substantiated or cast in doubt by the additional evidence and arguments of counsel.

At least since 1981, the law of the Second Circuit has provided that:

> [A] treating physician's opinion on the subject of medical disability, i.e., diagnosis and nature and degree of impairment, is: (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, although resolution of genuine conflicts between the opinion of the treating physician, with its extra weight, and any substantial evidence to the contrary remains the responsibility of the fact-finder.

*Schisler I*, 787 F.2d at 81. Since 1987, opinions of non-examining medical personnel cannot, in themselves, constitute substantial evidence to override the opinion of the treating source. *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir.1987); *Schisler II*, 851 F.2d at 47; *see also Havas v. Bowen*, 804 F.2d 783 (2d Cir.1986) (stating rule in dicta).

In *Stieberger*, we concluded that the cases adopted by SSA as SSRs were not consistent with the Second Circuit's treating physician rule. *See* 615 F.Supp. at 1346. None of the cases codified by SSRs but not considered by this Court in *Stieberger* states a rule resembling the treating physician rule. *See Celebrezze v. Bolas*, 316 F.2d 498 (8th Cir.1963) (discussing substantial evidence standard but no mention of treating physician); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (written report by physician who examined claimant may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant). For a discussion of *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir.1981), *see Stieberger*, 615 F.Supp. at 1346. In none of these cases did any of these courts mention that opinions of treating physicians were binding absent substantial evidence to the contrary. Nor did any of these courts even find that SSA had failed to give adequate weight to a treating physician opinion as to disability. Prior to *Schisler*, SSA never issued as an SSR any of the decisions of the Second Circuit stating the treating physician rule. PX 4.

Other SSRs, having not been put in context with the treating physician rule, may well have had the effect of obscuring the treating physician rule. SSR 83–19 describes the judgment of an examining physician concerning whether an impairment is so severe as to be equivalent to an impairment listed on a "Listing of Impairments" as "not controlling." PX 92. SSR 82–30, which relates to residual functional capacity ("RFC") assessments, does not mention the treating physician explicitly and provides only that when more than one physician has provided medical information, the information from each source "must be considered." PX 93.

Prior to the *Stieberger* injunction, none of the POMS provisions codified the treating physician rule. Several of the POMS indicated that information should be obtained from the treating physician or that a rational for the weight attributed to various medical factors must be included, but did not state the essential elements of the treating physician rule. Concerns emphasized in other POMS may well have helped eclipse the treating physician rule. For example, from June 1983 until September 30, 1985, POMS DI 00501.125(C)(2)(K) focused upon how to override a treating physician's opinion:

> The courts properly recognize the physician's medical competence as an expert in assessing the extent of the impairment, but they tend to include within his/her expert qualifications the assessment of nonmedical factors and the existence of "disability" itself.

> If the reporting physician includes in the medical evidence an opinion that the claimant is "totally and permanently disabled" or is "unable to work" and the decision is one of denial, the rationale in

the determination must be sufficiently compelling to clearly rebut the opinion.

The most effective means of overcoming such opinions is by the assessment of residual capacities, showing that the effects of the impairment are not "totally" disabling for all occupations in which the claimant might reasonably engage. Where the evidence and the rationale adequately present the basis for the conclusion, a contrary opinion in the file by a reporting physician could be effectively refuted.

PX 97.

Other materials prepared by SSA emphasized concerns which could also have had the effect of distorting or submerging the treating physician rule. The OHA Handbook § 5–42–10A indicated that one of the instances when the Appeals Council would grant "own motion review" was when:

> [i]mproper weight [is] given to treating physician's conclusion or claimant's allegation concerning disability—the ALJ decision gives undue weight to a treating physician's conclusion or the claimant's allegations (symptoms) concerning disability, which are not supported by medical evidence.

PX 102. As plaintiffs point out, the Appeals Council apparently did not grant "own motion review" when the ALJ had not given adequate weight to the treating physician's opinion. An April 29, 1982 memorandum from SSA's chief ALJ to all ALJs which addressed "problem areas" disclosed by ongoing Bellmon review identified "a tendency to accord undue weight to a claimant's allegations and/or a physician's opinions of 'disability' " as one such problem. PX 103. A 1978 OHA Manual entitled *Disability Evaluation Handbook* instructed trainees that:

no opinion or judgment of any physician shall be controlling or binding in any case, but shall only be given weight to the extent that it is supported by specific and complete clinical findings and is consistent with the other evidence of record as to severity and probable duration of the impairment or impairments involved . . .

PX 105. Finally, a sample decision used to train ALJs, first used in 1982, stated:

> The administrative law judge has given due consideration to the opinion of the claimant's physician that the claimant is totally disabled. However, such opinions are not determinative of the issue of disability. The evidentiary weight accorded to them must be measured in proportion to the degree to which they are supported by objective clinical data and to which they are consistent with the other evidence of record.

PX 106. Without clarification, this sample decision, though arguably not directly addressing the concerns of the treating physician rule, *i.e.* the diagnosis and nature and degree of impairment, could easily have given the impression that a treating physician's opinion of the degree of impairment was no different than any other evidence concerning that impairment.[13]

The Acquiescence Task Force ("Task Force"), a body formed in July 1985 to begin the implementation of SSA's new policy contained in Interim Circular 185 (*see infra* p. 751), concluded that SSA policy with respect to treating physicians differed from the law of eight circuits and suggested that "a ruling of nonacquiescence [was] needed in all circuits with the exception of the First, Sixth, Eighth and D.C. Circuits."[14] PX 107. The Task Force con-

---

**13.** In view of the significance of a determination of the nature and degree of impairment for the ultimate determination of disability, any discussion of the impact of a treating physician's opinion on the ultimate disability determination should at the very least have explicitly mentioned its far more substantial impact on the determination of the nature and degree of the impairment.

**14.** Defendants strenuously protest that the views of the Task Force are no more than views of

"someone somewhere in the Government who [was] not charged with litigating the case." Defendants' Memorandum at 30. While the Court is aware that the views expressed by the Task Force are not SSA policy statements, the observations of a body within the agency charged explicitly with "screening cases for acquiescence . . ." are obviously highly relevant to the Court's inquiry, especially to the extent they differ from the arguments of counsel for SSA. *Id.* at n. 36. While the Justice Department is clearly entitled

cluded that the treating physician rule, the "strictest" version of which it found in the Second Circuit, though perhaps not "in direct conflict with SSA policy, [was] sufficiently inconsistent to easily lead to reversible error at the court level." *Id.* The Task Force prepared a draft ruling stating in part that:

> the Court of Appeals has defined and provided a framework for evaluating the opinions and findings of treating and other examining physicians. While not incompatible with current SSA policy, this case law requires a written analysis and rationalization of findings and holdings, not required by SSA policy.

*Id.* Though circulated throughout SSA, this recommendation was never acted upon. According to the head of the Task Force, a draft ruling was never issued "[s]ince the Second Circuit's policy and our own on the weight to be accorded treating physician opinions have been declared by the Court to be in accord based on representations by SSA's counsel ..." PX 112. Thus, SSA also appears to have rejected recommendations by its own personnel that it issue instructions designed to bring SSA within compliance with the treating physician rule.

The evidence outlined above demonstrates that until enjoined by this Court SSA had never articulated the treating physician rule as its policy in any of the media through which it establishes its policies and communicates them to adjudicators. It is also clear that the policies which had been implemented only vaguely attempted to address areas of concern to the Second Circuit. Many times, the policies established by SSRs, POMS instructions and other SSA materials conspicuously failed to include the treating physician rule when discussing matters indisputably within the rule's scope. At other times there was sufficient tension between the treating physician rule and the language describing SSA policy for the Court to conclude that SSA's policy, when applied, would have had the principal effect of overriding the treating physician

rule. This evidence must of course be viewed against the background of SSA's general procedure with regard to court of appeals opinions. At various times and at different levels of the administrative review process, Second Circuit decisions were not circulated to adjudicators. In addition, except in response to this Court's decision in *Stieberger*, SSA adjudicators have not even been told that they must apply the holdings articulated by the Second Circuit.

Finally, SSA's erroneous claims to the *Schisler* Court that its proposed instruction codified the treating physician rule further confirms that SSA's policy prior to compliance with the *Stieberger* injunction was not in accord with the law of the Second Circuit, though counsel for SSA seems inexplicably to have believed otherwise. The Court has no choice but to conclude that SSA's counsel in *Schisler*, when he indicated to the Court of Appeals that SSA policy was "the same as" the treating physician rule, was simply wrong.

The astonishing volume of cases in which SSA disability determinations were overturned by courts firmly establishes that the differences between agency policy and the treating physician rule influenced SSA's adjudication of individual cases. For list of cases prior to *Stieberger*, see 615 F.Supp. at 134-48. *See also Hidalgo v. Bowen*, 822 F.2d at 296-97, where the Court remarked that:

> [the treating physician rule] has been our rule for the past 15 years ... [and] during those years we have observed the rule consistently misapplied. In fact, two years ago we observed that the cases in which we have reversed the denial of benefits due to the ALJ's failure to apply properly the treating physician rule are 'almost legion.' *DeLeon v. Secretary of HHS*, 734 F.2d 930, 937 (2d Cir.1984).
>
> 'Legion' should no longer be modified by 'almost.' We have relied upon the treating physician rule in 23 cases in

---

to formulate the government's position with respect to whether agency policy and Second Circuit holdings differ, this cannot preclude the Court from considering the observations of a

body with some interest in objectivity like the Task Force in assessing whether the Justice Department's position is accurate.

which the administrative decision denying disability benefits has been either reversed or remanded ... (citations omitted).

We cite these cases to emphasize how often the rule has been expounded, and also to indicate some sense of frustration at how little, if any, impact our decisions have had on the Secretary and his administrative fact-finders.

There can be no question but that there was a system-wide pattern of mistaken adjudication at least until the date of compliance with the *Stieberger* injunction.

Defendants contend that any finding that they failed to comply with Second Circuit law would be a "hindsight-laden treatment which ignores the way in which precedent develops overtime." Defendants' Memorandum at 44. Notwithstanding defendants' point that the Second Circuit's holding that opinions of non-examining medical personnel cannot by themselves override the opinion of a treating physician was not codified by the Second Circuit until *Hidalgo* in 1987, the other aspects of the treating physician rule were clearly "a firmly embedded part of the [Second Circuit's] Social Security jurisprudence" since at least 1981. *Stieberger*, 615 F.Supp. at 1344. As was illustrated above, until court ordered relief took effect SSA's policy was not the treating physician rule as it existed since 1981. Defendants' argument really amounts to nothing more than an attempt to exploit both the fact that an additional aspect of this rule was firmly codified after 1981 and that minor semantic differences can always be detected between statements of the same rule by different courts.

Though plaintiffs allege that SSA failed to acquiesce in the Second Circuit holding that opinions of non-examining physicians cannot by themselves constitute substantial evidence to override a treating physician's opinion, there is no basis for their charge. The dicta in *Havas v. Bowen* notwithstanding, the Second Circuit actually adopted this rule as a holding in *Hidalgo v. Bowen* on June 26, 1987. Since the *Schisler* ruling containing this holding was distributed on October 29, 1987, SSA policy differed from the Second Circuit holding for only four months. There is no evidence of a system-wide pattern of mistaken adjudication during those four months.

Plaintiffs also contend that SSA non-acquiesced by impermissibly requiring that opinions of treating physicians be supported by clinical or laboratory evidence. In *Bluvband v. Heckler*, 730 F.2d 886, 893 (2d Cir.1984), the Second Circuit explicitly held that the treating physician's medical testimony did not have to be supported by objective clinical or laboratory evidence. *See also Eiden v. Secretary of HEW*, 616 F.2d 63, 64 (2d Cir.1980). Since that time, however, there has been some question as to whether Section 3(a)(1) of the Reform Act overruled this holding. *See* 42 U.S.C.A. § 423(d)(5)(A) (1990);[15] *Schisler I*, 787 F.2d at 82 n. 2; *Smith v. Bowen*, 687 F.Supp. 902, 905 (S.D.N.Y.1988); *Brandon v. Bowen*, 666 F.Supp. 604, 608 n. 5 (S.D.N.Y.1987). In *Schisler II*, 851 F.2d at 45–46 n. 1, the Second Circuit noted that the district court had:

> correctly eliminated the draft SSR's requirement that the treating physician's opinion be supported by clinical or laboratory evidence. We have eliminated similar language concerning medical

---

**15.** Section 3(a)(1) of the Reform Act provides: An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence required to be furnished under this paragraph ... would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques ... must be considered in reaching a conclusion as to whether the individual is under a disability.

opinions from doctors other than a treating physician.

We cannot say with certainty, however, that *Schisler II* reaffirmed the holding in *Bluvband*. In light of the uncertainty surrounding this particular holding in the Second Circuit, the Court cannot conclude that SSA was obligated to affirmatively state this holding as policy.

We find that SSA non-acquiesced in the treating physician rule until the date of compliance with the *Stieberger* injunction. We also reject plaintiffs' claims that SSA non-acquiesced in the holdings that opinions of non-examining physicians cannot by themselves constitute substantial evidence to override a treating physician's opinion and that the treating physician's medical testimony did not have to be supported by objective clinical or laboratory evidence.

### c. The Right to Cross–Examine the Authors of Post–Hearing Reports

■ The Second Circuit has established that SSA cannot base a disability decision upon a report obtained after a hearing before an ALJ, unless the claimant against whom the report is introduced is given an opportunity to cross-examine the authors of the report. *See Townley v. Heckler,* 748 F.2d 109, 114 (2d Cir.1984); *Gullo v. Califano,* 609 F.2d 649, 650 (2d Cir.1979); *see also Dorman v. Harris,* 633 F.2d 1035, 1039 (2d Cir.1980) (when additional evidence becomes available after hearing, ALJ must reopen the hearing to permit claimant to "confront" it).[16] SSA evidently chose not to seek review of any of these decisions in the Supreme Court.

There are substantial differences between SSA policy and this Second Circuit holding. Nowhere in their motion papers

do defendants explicitly represent that their policies encompass the Second Circuit's holding concerning the consideration of post-hearing reports. None of the decisions establishing the right to cross-examine the authors of post-hearing reports has been adopted by SSA as an SSR. SSA regulations 20 C.F.R. §§ 404.950(d), 416.-1450(d) (1989) provide that a written request to subpoena a witness must be filed at least five days before the ALJ hearing in a case and that a subpoena will be issued when the ALJ or the Appeals Council concludes that it is "reasonably necessary for the full presentation of a case." On their face, these regulations do not even indicate that a witness can be subpoenaed after the ALJ hearing, much less that a claimant *must* be given the opportunity to subpoena the author of a report obtained after the hearing if that report is to serve as a basis for the ALJ's decision.[17]

The OHA Handbook includes a general admonition that adjudicators should "make every reasonable effort to follow the district or circuit courts' views regarding procedural or evidentiary matters when handling similar cases in that particular district or circuit." Handbook § 1–161, PX 6. Since this provision does not define "views", does not set out what these "views" are, does not direct an adjudicator to any of the sources where these "views" can be found, and does not explicitly instruct the adjudicators to apply these "views," this provision cannot be said to harmonize SSA policy with all holdings of courts of appeal on "procedural or evidentiary matters," as it apparently attempts to do. Even more significantly, the Court presumes that when one of these "views" differs from SSA policy, adjudicators are

---

**16.** Two of the cases cited by plaintiffs as establishing this rule did not involve reports or other evidence introduced after a hearing. The holdings in both cases are based primarily upon the special duties adjudicators owe pro se claimants and turn in significant measure upon the particular facts in the cases. *See Cullinane v. Secretary of HHS,* 728 F.2d 137, 139 (2d Cir.1984) (where accuracy of report considered at hearing was called into question due to bias of the author, ALJ should have told that pro se plaintiff of her right to subpoena and cross examine author of the report); *Fernandez v. Schweiker,*

650 F.2d 5 (2d Cir.1981) (pro se claimant in "cases of this type" whose ability to cope with life's responsibilities was in doubt and who repeatedly protested and complained about accuracy of report considered at hearing should have been told of right to subpoena authors of adverse report).

**17.** Indeed, the Task Force concluded that the subpoena procedure outlined in the regulations "cannot be utilized with respect to a post-hearing report." PX 65.

still to follow SSA's general instruction to apply SSA policy. *See infra* pp. 754–55, 757.

The OHA Handbook also provides that claimants must be notified of post-hearing evidence and given the opportunity to object to it, comment upon it or refute it with additional evidence, that requests to cross-examine consultative physicians should generally be granted only when the claimant shows " 'good cause' why such cross-examination is necessary," and that a showing of good cause includes "a presentation of the facts the party intends to establish by the cross-examination, and the specific reasons why the questions could not be answered by written interrogatories." Handbook §§ 1–518, 1–522, 1–730, 1–731; PXs 69 & 70.

In an April 29, 1986 memorandum to the Task Force, the Office of the General Counsel Social Security Division indicated that it interpreted the Handbook to mean that:

the [claimant] has the same rights to object, comment and/or refute post-hearing evidence as the party has at the ALJ hearing under 20 C.F.R. 404.950 and 416.1450. These rights include the right to request subpoenas and cross-examine witnesses, unless those rights are knowingly waived.

PX 68. It should be noted at the outset that the Court has no basis for concluding that this interpretation of the Handbook provisions actually reflects SSA policy, in part because there is no indication that the April 29, 1986 memorandum was circulated to anyone in SSA other than the Task Force. Moreover, the Handbook provisions on their face provide no indication that the procedures for cross examining authors of reports are even applicable to post-hearing reports. Even if these procedures were presumed to be applicable, the Handbook would still require that claimants present specific reasons why the questions could not be answered through written interrogatories and the facts to be established through the cross-examination in order to subpoena the authors of post-hearing reports. While SSA might argue that a claimant would always be able to show good cause when a report is to serve as a basis for the ALJ's decision,[18] SSA's policy would still place a significant obstacle between a group of potentially unsophisticated claimants often proceeding pro se and a right accorded them by Second Circuit decisions.

Finally, it is apparent that even SSA did not really believe that agency policy provided for a right to cross-examine the authors of post-hearing reports. In a September 16, 1985 memo to the Office of General Counsel, the Chairman of the Task Force indicated that it was the Task Force's view that SSA's practice regarding post-hearing reports conflicted with the requirements of various courts of appeal, but that an AR was not required because "the acquiescence ruling contemplated by [Interim Circular] 185 seems unsuited to decisions involving procedural matters." *Id.* In an October 17, 1985 memorandum in response to the Task Force's recommendation, the Associate Commissioner of the OHA acknowledged that "some circuit court case law does conflict with SSA policy with regard [to] the claimant having an opportunity to cross-examine authors of reports offered in evidence." *Id.* In an April 29, 1986 memorandum, the Office of General Counsel stated that while it believed that the OHA Handbook could be "interpreted to provide the due process rights required by the various court decisions," it also recommended that:

... [a]n expanded section 1–730 should explicitly provide that when post-hearing evidence is received, the claimant will be given an opportunity to subpoena and cross-examine the author of such evidence ... [and] the claimant has to be

---

18. It is by no means clear that SSA could even advance this argument. In an October 17, 1985 memorandum to the Task Force, the Associate Commissioner of OHA stated that:

it is SSA policy that before an ALJ will issue a subpoena to require the appearance of an

individual for purposes of cross-examination, the claimant has to show that the cross-examination is *essential* and that the facts expected to be established cannot be established by other means.

PX 68 (emphasis added).

informed of the right to ... cross-examine the author of the evidence.

*Id.*

OHA later explicitly rejected a proposal that it amend its policies to comply with the rule articulated by the Second Circuit. A February 21, 1986 memorandum from the Task Force proposed:

> Why not change the present procedures to include the right to cross-examine the authors of post-hearing reports? After all, we currently give the claimant the right to see and comment on these reports. Moreover, the ALJ would still have discretion in allowing cross-examination after the opportunity is given since the claimant must show that cross-examination is essential and the facts cannot be adduced by other means.

PX 50. In a June 17, 1986 reply memorandum to the Task Force explicitly rejecting the Task Force's suggestion the Associate Commissioner of OHA explained:

> In my memorandum to the OHA adjudicators, I have reminded them to follow the current profert procedures set forth in the OHA Handbook. I recognize that some courts may not find this approach acceptable. They may require that we provide notice to claimants of their right to cross-examine authors of post-hearing reports, or at least of their right to request cross-examination. However, in view of the various initiatives underway concerning adjudicative consistency as well as the regulatory proposals concerning securing reports from treating physicians, I am not prepared to completely change our procedures at this time.

PX 52. A June 17, 1986 memorandum from the Associate Commissioner of OHA simply reminded adjudicators to follow the OHA Handbook procedures. PX 51.

The evidence in the record reveals that there are significant differences between SSA policy concerning a claimant's right to cross-examine the authors of post-hearing reports and the holdings of the Second Circuit. While there appear to be no more than a couple of district court cases in which SSA adjudicators failed to follow the Second Circuit's rule regarding a claimant's right to cross-examine the authors of post-hearing reports, *see Tripodi v. Heckler,* 100 F.R.D. 736, 739 (E.D.N.Y.1984); *Lora v. Bowen,* No. 85–7063, 1987 WL 16151 (S.D.N.Y. August 14, 1987), the Court accepts the uncontradicted conclusion of the Task Force that SSA's general practice has been "to utilize post-hearing evidence quite frequently and to place upon the claimant the burden of asserting the right to cross-examine, presuming a waiver of that right where no such request is made." PX 65 at 1. The Court concludes that SSA has non-acquiesced in the Second Circuit decisions concerning the consideration of post-hearing evidence.

### d. ALJ's Personal Observations

Plaintiffs cite two cases which they claim totally prohibit ALJs from "making assessments of a claimant's credibility based upon observations of the claimants' physical or mental condition at the hearing." Plaintiffs' 3(g) Statement ¶ 433. Neither case establishes such a rule. However, the Second Circuit has clearly indicated the "limited weight" to be given to such observations in deciding substantive issues. In *Carroll v. Secretary of HHS,* 705 F.2d 638, 643 (2d Cir.1983), the Second Circuit noted that an ALJ's observation that a claimant had "sat through the hearing without apparent pain" was the opinion of a lay person and was "entitled to but limited weight" on the issue of whether the claimant suffered pain. In *DeLeon v. Secretary of HHS,* 734 F.2d 930, 935 (2d Cir. 1984), the Court stated that the ALJ's observations concerning the claimant's demeanor or appearance "do not really contribute toward meeting the substantial evidence burden in cases of this nature." *See also Rivera v. Schweiker,* 717 F.2d 719 (2d Cir.1983) (ALJ's observations entitled to limited weight); *Aubeuf v. Schweiker,* 649 F.2d 107, 113 & n. 7 (2d Cir.1981) (ALJ's reliance on own observations to rebut treating physicians' observations and claimant's testimony "rais[ed] serious questions with respect to the propriety of subjecting claimants to a 'sit and squirm index,' and with respect to rendition by the ALJ of an ex-

pert medical opinion which is beyond his competence").

Taken together, these Second Circuit cases establish that an ALJ may accord his personal observations of the claimant's physical and mental condition only limited weight in deciding the substantive issues in the case. None of these cases can be interpreted as modifying the rule that an ALJ is permitted, and indeed expected, to consider a claimant's demeanor in assessing the claimant's credibility.[19] *See Rivera*, 717 F.2d at 724 ("clearly permissible for an [ALJ] to evaluate credibility of individual's allegation of pain"); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979). There are also reasons to believe that *DeLeon* was not intended to forbid completely ALJs from relying upon their own observations in deciding the substantive issues in a case. In addition to the wording of the holdings in *DeLeon, Carroll, Rivera* and *Aubeuf* themselves, the Court in *Ferraris v. Heckler*, 728 F.2d 582, 586 n. 1 (2d Cir.1984), decided virtually simultaneously with *DeLeon*, explicitly accepted an ALJ's own observations of a claimant at his hearing as probative of extent of pain suffered by claimant.[20]

There are significant differences between agency policy and the Second Circuit's rule regarding the consideration by an ALJ of his own personal observations. None of the cases outlining the Second Circuit's holdings has been adopted as an SSR. SSR 88–13, adopted in 1988, states:

In evaluating a claimant's subjective complaints of pain, the adjudicator must give full consideration to all of the available evidence, medical and other, that reflects on the impairment and any attendant limitations of function ... In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject that individual's subjective complaints solely on the basis of such personal observations.

DX 26 at 93. It should be noted first that this instruction was not in effect between 1981 and 1988, a period during which plaintiffs allege SSA non-acquiescence occurred. Moreover, the provision deals only with evaluating a claimant's "subjective complaints of pain," and fails to address the other instances where an ALJ could accord weight to his personal observations of the claimant's physical and mental condition. Finally, the concern of the Second Circuit is not with the rejection of complaints "solely on the basis of such personal observations", but rather that such observations not be given undue weight. Under SSR 88–13, an ALJ could accord his own observations as much weight as he wishes as long as some other evidence, no matter how insignificant, could also serve as a basis for rejecting the claimant's subjective complaints.

The Task Force observed that "SSA's policy on credibility is quite general" and that "the courts have been much more specific than SSA policy," PX 126 at 14–15, and recommended that a set of general principles derived from court decisions be communicated to adjudicators. These principles included a direction that:

---

**19.** When an ALJ concludes on the basis of claimant's demeanor as a witness that the claimant's testimony that he suffers substantial pain is not believable, he makes a credibility assessment. In contrast, when an ALJ concludes that the claimant does not suffer pain because the claimant does not appear to be suffering pain while he is testifying, the ALJ is using his personal observations as a basis for deciding the substantive issues in the case. Similarly, when an ALJ concludes that a claimant's testimony that he suffers pain is not believable because the claimant does not appear to be suffering pain as he is testifying, the ALJ is using his personal observations to decide a substantive issue.

**20.** Prior to *DeLeon*, consideration by the ALJ of his or her own observations appears to have been explicitly permitted. *See Varela v. Secretary of HHS*, 711 F.2d 482 (2d Cir.1983) ("Although we do not reject the possibility that on the basis of his own direct observations an ALJ may disregard an examining psychiatrist's diagnosis, nevertheless, before doing so the ALJ should make a more complete and revealing record than has been established here."); *Vega v. Harris*, 636 F.2d 900, 904 (2d Cir.1981) (affirming ALJ's rejection of claim of disabling pain based upon observations of claimant's movement). That *DeLeon* failed to even mention *Varela* or *Vega* would also seem to indicate that the Second Circuit did not intend to wholly overrule these earlier holdings.

[w]hile ALJ observations can be very valuable, care should be taken not to engage in what the courts have characterized as 'sit and squirm' jurisprudence. In cases of psychological impairments, particular care should be taken not to give undue weight to the ALJ's observations.

PX 50 at 3. The June 17, 1986 memorandum from the Associate Commissioner of OHA outlined a rather different set of principles which it described as "circuit court preferences," including a statement that as long as findings are "rationalized" in the ALJ's decision,

... it is appropriate to ... consider the claimant's motivation as well as self-interest or bias on the part of witnesses, to consider inconsistencies in testimony, to consider failure to seek treatment for relief, and to find testimony unconvincing for specified reasons.

PX 51 at 2–3. The Associate Commissioner suggested that if complied with, these principles would have "a significant payoff." *Id.* at 1. The memorandum quite clearly did not convey the Second Circuit's holding regarding an ALJ's consideration of his own observations.

The sustained pattern of cases where this difference between SSA policy and Second Circuit decisions clearly influenced the ALJ's decision is sufficient to establish a practice of non-acquiescence. *E.g., Hills v. Secretary of HHS*, 726 F.Supp. 434, 436 (S.D.N.Y.1989); *Figueroa v. Bowen*, No. 87–2966, 1989 WL 29960 (S.D.N.Y. March 24, 1989) (WESTLAW, DCT file); *Torres v. Bowen*, 700 F.Supp. 1306, 1315 (S.D.N.Y. 1988); *Cruz v. Bowen*, No. 87–0322, 1987 WL 19965 (S.D.N.Y. Nov. 12, 1987) (WESTLAW, DCT file); *Brandon v. Bowen*, 666 F.Supp. 604, 608–09 & n. 8 (S.D.N.Y.1987); *Guardino v. Bowen*, 662 F.Supp. 781, 786–87 (S.D.N.Y.1987); *Johnson v. Bowen*, No. 84–7661, 1987 WL 9692 (S.D.N.Y. April 16, 1987) (WESTLAW, DCT file); *Phelan v. Bowen*, No. 84–1362, 1987 WL 5364 (S.D. N.Y. Jan. 7, 1987) (WESTLAW, DCT file); *Ceballos v. Bowen*, 649 F.Supp. 693, 701–02 (S.D.N.Y.1986); *Bardabelias v. Secretary, HHS*, No. 85–4373, 1986 WL 14618 (E.D. N.Y. Oct. 31, 1986) (WESTLAW, DCT file);

*Louissaint v. Heckler*, No. 85–2624, 1986 WL 12106 (S.D.N.Y. Oct. 17, 1986) (WESTLAW, DCT file); *Cabrera v. Heckler*, No. 85–6573, 1986 WL 9228 (S.D.N.Y. Aug. 11, 1986) (WESTLAW, DCT file). The Court finds that SSA has non-acquiesced in the Second Circuit's holding concerning an ALJ's consideration of his own observations.

### e. The Standards for Evaluating Credibility

■ The Second Circuit has established that a claimant with a good work record is entitled to substantial credibility when claiming inability to work because of a disability. *Rivera*, 717 F.2d at 725. *See also Singletary v. Secretary of HHS*, 623 F.2d 217, 219 (2d Cir.1980) (prior work history justifies the inference that when claimant stopped working, he did so for the reasons testified to). No SSA policy statement even arguably restates this rule, and the number of cases in which courts have found that SSA failed to give the claimant's work history sufficient weight in assessing the credibility of a claimant asserting a disability suggests that this difference between SSA policy and the holding of the Second Circuit has influenced SSA's adjudication of cases. *See, e.g., Williams v. Bowen*, No. 87–0909, 1989 WL 1307 (S.D. N.Y. Jan. 5, 1989) (WESTLAW, DCT file); *Abadsidis v. Bowen*, No. 86–7599, 1987 WL 19281 (S.D.N.Y. Oct. 23, 1987) (WESTLAW, DCT file); *Brandon v. Bowen*, 666 F.Supp. 604, 608 n. 6 (S.D.N.Y.1987); *Watzinger v. Bowen*, No. 83–4413, 1987 WL 7558 (E.D. N.Y. Feb. 18, 1987) (WESTLAW, DCT file); *Cubeta v. Secretary of HHS*, No. 79–1831, 1987 WL 7559 (E.D.N.Y. Feb. 11, 1987); (WESTLAW, DCT file); *Kassabian v. Heckler*, No. 84–8031, 1986 WL 9690 (S.D. N.Y. Aug. 25, 1986) (WESTLAW, DCT file); *Cabrera v. Heckler*, No. 85–2624 (S.D.N.Y. Aug. 11, 1986) (WESTLAW, DCT file); *Kurowski v. Bowen*, No. 84–1031E, 1986 WL 8708 (W.D.N.Y. Aug. 6, 1986) (WESTLAW, DCT file); *Visser v. Heckler*, No. 83–3479, 1986 WL 2205 (S.D.N.Y. Feb. 10, 1986) (WESTLAW, DCT file).

Plaintiffs cite four Second Circuit cases for the proposition that SSA adjudicators

must make specific findings with respect to the credibility of claimants and their witnesses. Two of these cases do not directly support such a rule.[21] The holding in another could in good faith be given a limiting construction.[22] However, any ambiguity in the language of earlier cases is redressed by *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir.1988), which, citing *Carroll*, explicitly held that "[a] finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record."

While arguably not inconsistent with the Second Circuit holdings, SSA's policy does differ in certain respects from the Second Circuit holdings with respect to credibility findings. The general admonitions to "look fully into the issues" and to "give[ ] findings of fact and the reasons for the decision" in the Social Security regulations fail to isolate the concern of the Second Circuit. Again, none of the cases outlining the Second Circuit's holdings has been adopted as an SSR. SSR 88–13, adopted in 1988, provides:

> in all cases in which pain is alleged, the determination or decision rationale is to contain a thorough discussion and analysis of the objective medical evidence and the non-medical evidence, including the individual's subjective complaints and the adjudicator's personal observations.

DX 26 at 93. This instruction, though going much of the way toward addressing the concern of the Second Circuit's holding, still does not require "discussion and analysis" where pain is not alleged or where assessment of the witness' credibility was not related to the ultimate "determination or decision rationale," such as a determination not to permit a witness to testify on the record. The OHA Handbook § 1–351–35 similarly requires specific findings on credibility only in cases where the claimant alleges disabling pain.[23] PX 123.[24]

The Court need not decide whether there are substantial differences between SSA policy and the Second Circuit law regarding credibility findings, however, for the evidence in the record is not sufficient for a determination that the differences have influenced the agency's adjudication of cases. Since *Williams* only a couple of courts have found that SSA failed to apply this rule. *See Baran v. Bowen*, 710 F.Supp. 53, 55 (S.D.N.Y.1989); *Weber v. Bowen*, No.

**21.** *See Rivera v. Schweiker*, 717 F.2d at 724 (credibility assessment should be made in light of all the evidence regarding the extent of pain); *Singletary v. Secretary of HHS*, 623 F.2d at 219 (testimony of lay witnesses admissible).

**22.** In *Carroll v. Secretary of HHS*, 705 F.2d at 643, the Court indicated that "[a]lthough the ALJ was not required to credit [the claimant's] testimony, he would normally be expected to note his rejection of it in whole or part." Although this language was also quoted in *Bluvband v. Secretary of HHS*, 730 F.2d at 894, the Court might in both cases have been responding to the argument that the ALJ had found the testimony of the claimant incredible. As a result, the Court's language can be interpreted simply as a ruling that absent explicit comment from the ALJ no such assumption was warranted, at least in those particular cases. Alternatively, the phrasing of the Court's holding could have been intended to suggest that an ALJ would be expected to make specific credibility findings for the specific kind of testimony in those cases.

**23.** With regard to this OHA Handbook provision, the Task Force found that requiring specific credibility findings only in cases where the claimant alleges disabling pain, "may be giving the unintended message that credibility findings are not material in connection with other issues." PX 50 at 3.

**24.** As part of its recommended set of general principles derived from court decisions, the Task Force included an instruction that "[f]or all types of cases and issues, where material to the determination, specific credibility findings should be made with reasons given." PX 50 at 3. The June 17, 1986 memorandum from the Associate Commissioner of OHA included in its list of "circuit court preferences" the rule that "where credibility is material to the decision, specific credibility findings should be made with reasons given." PX 51 at 2. While accurately restating the Second Circuit's holding, the memorandum did not indicate that the principle was being incorporated as agency policy or even that adjudicators were required to apply it to cases. The "preferences" in the June 17, 1986 memorandum are merely described as "general guidelines which, when applied with care and common sense, can improve the quality of our decisions and enhance our credibility with the courts." *Id.* at 1. *See infra* p. 755.

87–4617, 1988 WL 138160 (S.D.N.Y. Dec. 13, 1988) (WESTLAW, DCT file).[25] Here, the absence of a significant number of cases where SSA failed to apply this holding coupled with the absence of any acknowledgment by SSA of failure to apply the holding leads us to conclude that plaintiffs have not established non-acquiescence to their detriment in this area of the law.

Plaintiffs also argue that *Singletary*, 623 F.2d at 219, holds that there can be no presumption that testimony of a claimant's friends and family members is biased and that SSA has non-acquiesced in this particular holding. In *Singletary*, the ALJ rejected the testimony of the claimant's son as to the claimant's alcoholism and inability to work because the son was not a doctor and was biased. The Second Circuit stated that:

> While possible bias [was] undoubtedly a factor which would go to *weight* of the son's testimony, the son had first hand knowledge of a claimant's alcohol intake and lifestyle. The testimony of lay witnesses has always been admissible with regard to drunkenness. Rule 701, F.R. Evid.; *People v. Eastwood,* 14 N.Y. 562, 566 (1856).

*Id.* at 219 (emphasis in original). *Singletary* can be read to hold only that, despite possible bias, the testimony of a relative could be probative of certain issues in the case of which the relative has knowledge. The relatively unusual factual circumstances in *Singletary* seem unlikely to recur with any frequency. Unless SSA had some reason for believing that there was a risk that agency adjudicators would refuse to even consider otherwise probative evidence solely because it came from a relative, it could not be expected to include such a rule in its policy. The absence of cases where otherwise probative testimony has not been considered for that reason confirms that such a statement of policy would have been unnecessary.

### f. The Duty to Accord Weight to the Determinations of Other Agencies

The Second Circuit has established that while the determination of another government agency that a claimant is disabled is not binding upon SSA, it is entitled to some weight and should be considered. *Havas v. Bowen,* 804 F.2d at 786 n. 1; *Hankerson v. Harris,* 636 F.2d 893, 896–97 (2d Cir.1980); *Parker v. Harris,* 626 F.2d 225, 233 (2d Cir.1980); *Cutler v. Weinberger,* 516 F.2d 1282, 1286 (2d Cir.1975). The Task Force characterized the Second Circuit decisions as treating the issue "as a factual matter in relation to the facts of the particular case." PX 128 at 3. In point of fact, no language in any of these decisions suggests that their holdings were to be restricted to any particular facts.

Significant differences can be found between SSA policy and this holding. 20 C.F.R. §§ 404.1513(e), 416.913(e) (1989) provide that: "information from other sources, ... includ[ing] [p]ublic and private social welfare agencies, ... may also help us to understand how your impairment affects your ability to work." It is apparent that nothing in this regulation obligates SSA to consider determinations of other agencies, much less to accord them some weight. Moreover, 20 C.F.R. §§ 416.904, 404.1504 (1989) stipulate:

> A decision by any other governmental agency about whether you are disabled or blind is based upon its rule and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on Social Security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

The Task Force reasoned in essence that because SSA regulations did not expressly prohibit consideration of determinations by other agencies, the determinations would be given some weight. PX 128 at 2. Even accepting as true the Task Force's assumption that the determinations of other agen-

---

**25.** *See also Holland v. Bowen,* No. 88–2301, 1988 WL 25112 (S.D.N.Y. March 7, 1988) (WESTLAW, DCT file); *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987); *James v. Bowen,* No. 85–6379, 1987 WL 15123 (S.D.N.Y. July 28, 1987) (WESTLAW, DCT file).

cies would be considered pursuant to this regulation, they could still be routinely rejected and accorded no weight.

The February 21, 1986 memorandum from the Task Force to the OHA Associate Commissioner indicated that:

> As a safeguard against a possible appearance of inconsistency between the pertinent operating instructions regarding disability determinations made by other agencies and the regulations, we recommend reminding adjudicators that such determinations are material evidence within the meaning of 20 C.F.R. § 404.944, which should be considered by them and reflected in the disability determination.

PX 50 at 6. The June 17, 1986 memorandum from the Associate Commissioner advised OHA adjudicators that determinations of other agencies are to be considered "material evidence" [26] which "should be explained and rationalized as to what weight is given to them in the decision." PX 51 at 4. This memorandum obviously cannot redress any non-acquiescence that took place between 1981 and 1986, a period during which plaintiffs allege SSA non-acquiescence. Moreover, as stated earlier (*see supra* note 24), this memorandum does not indicate that it is to become agency policy or require that adjudicators apply the principles described therein, but merely outline court "preferences" which then can be used to improve the quality of decisions and enhance credibility with courts. Finally, although no reason is advanced why the Second Circuit's holding is not applicable to state level adjudicators, the memorandum was apparently not distributed at the state level or incorporated into instructional material for state adjudicators.

At the same time, however, the handful of cases in which courts have found that this rule was not applied falls far short of revealing that this omission has had a substantial impact on the agency's adjudication of cases. *See Wallace v. Bowen,* 678 F.Supp. 431, 435 n. 2 (S.D.N.Y.1987); *Fusco v. Bowen,* No. 85–371, 1987 WL 18771 (E.D.N.Y. Oct. 6, 1987) (WESTLAW, DCT file); *Visser v. Heckler,* No. 83–3479 (S.D. N.Y. Feb. 10, 1986) (WESTLAW, DCT file); *see also Dunbar v. Califano,* 454 F.Supp. 1261, 1267–68 (W.D.N.Y.1978). Without additional evidence, the Court cannot conclude that SSA's practice with respect to the Second Circuit's holding concerning the determinations of other governmental agencies can be considered non-acquiescence.

g. The Duty to Assist Pro Se Claimants

▮ Under the law of the Second Circuit, ALJs have a duty to develop the record fully for pro se claimants. *E.g., Cutler v. Weinberger,* 516 F.2d at 1286 (duty to "scrupulously and conscientiously ... probe into, inquire of, and explore for all the relevant facts"); *Gold v. Secretary of HEW,* 463 F.2d 38, 43 (2d Cir.1972) (must undertake "searching investigation" of the record). Before rejecting a conclusory opinion by a pro se claimant's treating physician, an ALJ must inform the claimant of his proposed action and provide an opportunity for the claimant to obtain a more detailed statement.[27] *Hankerson v. Harris,* 636 F.2d at 896; *Echevarria v. Secretary of HHS,* 685 F.2d 751, 756 (2d Cir.1982); *Bluvband v. Heckler,* 730 F.2d at 895.

Though neither the SSA regulations nor the OHA Handbook specifically instruct ALJs that they have a *heightened* duty with respect to pro se claimants, SSA regu-

---

**26.** The term "material evidence" is sufficiently similar in meaning to "according probative weight" for the Court to conclude that these memoranda accurately state the holdings of the Second Circuit. Black's Law Dictionary defines "material evidence" as evidence that is "relevant and goes to the substantial matters in dispute, or has a legitimate and effective influence and bearing on the decision of the case." Black's Law Dictionary 1128 (4th ed. 1968). Probative

evidence is evidence "tending to prove or actually proving." *Id.* at 1367.

**27.** Plaintiffs do not appear to claim that these Second Circuit holdings apply to state level adjudicators. Since the parties have not addressed explicitly either this issue or whether SSA's instructions to state adjudicators differ from the Second Circuit's holdings with respect to pro se claimants, the Court will refrain from deciding those issues.

lations do provide generally that an ALJ "looks fully into the issues," questions the claimant and the other witnesses, accepts as evidence any documents that are material to the issues, and makes "a complete record of the hearing proceedings." 20 C.F.R. §§ 404.944, 404.951 & 416.1444, 416.1451 (1989). The regulations further provide that the ALJ "shall issue a written decision based on the hearing record" which "gives findings of fact and the reasons for the decision." 20 C.F.R. §§ 404.929, 404.953 & 416.1429, 416.1453 (1989). Presumably, if an SSA adjudicator fulfilled his obligations under these regulations in each case, the record would be fully developed in every case involving a pro se claimant, and SSA's policy could be said to coincide with the holdings of the Second Circuit.

Additional SSA materials, though not instructing adjudicators to apply the Second Circuit's holdings regarding pro se claimants, can be said to have at least attempted to remind adjudicators that the requirements of SSA regulations must be met in cases involving pro se claimants. SSR 77–4, which concludes that a prisoner must be given an oral hearing when he alleges a cognizable right that may be prejudiced by SSA's determination, quotes in support of its conclusion the language in *Gold*, 463 F.2d at 43, stating that when "the guiding hand of counsel is not present ... a duty devolves on the hearing examiner to scrupulously and conscientiously probe into, and inquire or, and explore for all relevant facts." The June 17, 1986 memorandum from the OHA Associate Commissioner, though failing to instruct adjudicators explicitly to apply the holdings described therein, did state that: "An ALJ needs to be particularly sensitive when developing the record where a *pro se* claimant is involved." PX 51 at 3. An April 14, 1989 memorandum from the Associate Commissioner of OHA, though suffering the same shortcomings as the June 17 memorandum, did include a portion of *Echevarria*, 685 F.2d at 755, which read:

Where, as here, the claimant is unrepresented by counsel, the ALJ is under a heightened duty ' "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" ' ... A reviewing court must determine whether the ALJ 'adequately protect[ed] the rights of [a] pro se litigant by ensuring that all of the relevant facts [are] sufficiently developed and considered.'

DX 31.

Taken as a whole, SSA policy, in word if not in spirit, basically encompasses the Second Circuit's rule with respect to an ALJ's duty in pro se cases to develop the record, though it wholly fails to include the holdings concerning when an ALJ must inform the claimant of his proposed action and provide an opportunity for the claimant to obtain a more detailed statement from his treating physician. However, the relatively few cases in which this holding has not been applied over a rather substantial period of time cast doubt on whether this difference between Second Circuit law and SSA policy has influenced agency adjudication of individual cases. *See Rodriguez v. Schweiker*, 520 F.Supp. 666, 673 (S.D.N.Y. 1981); *Hernandez v. Heckler*, 585 F.Supp. 338, 342–43 (S.D.N.Y.1984); *Ramirez v. Secretary of HHS*, No. 85–7778, 1986 WL 11191 (S.D.N.Y. Sept. 26, 1986) (WESTLAW, DCT file); *Wallace v. Bowen*, 678 F.Supp. 431, 435 (S.D.N.Y.1987); *Sobocinski v. Bowen*, 678 F.Supp. 55 (S.D.N.Y. 1987). These cases, without any additional evidence of any impact upon agency adjudication, are not adequate for plaintiffs to sustain their burden of showing that SSA's practice with respect to this particular holding constituted deliberate non-acquiescence.

Plaintiffs cite *Cullinane v. Secretary of HHS*, 728 F.2d at 139, for the rule that ALJs must inform pro se claimants specifically of their right to subpoena and cross-examine witnesses. Since the Court has found that the holdings in *Cullinane* and *Fernandez v. Schweiker*, 650 F.2d at 8, could in good faith be limited to their facts, *see supra* note 16, SSA cannot be said to have been obliged to include such a rule as policy. Plaintiffs also describe *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir.1984), as establishing a rule that an ALJ must in-

quire into a pro se claimant's previous disability and subjective complaints. However, *Mimms* can be read as simply explaining what the ALJ could have done to fulfill his duty to develop the record fully in that particular case and stressing that a prior disability and subjective complaints can be highly probative evidence in such proceedings.

#### 4. *SSA's Formal Acquiescence Policy*

 Plaintiffs seek relief not only with respect to past adjudications alleged to have been erroneously rendered as a result of SSA's non-acquiescence policy but also to require SSA to alter its policy for the future. We have already determined that there has been non-acquiescence in certain specific areas of the law. We now examine whether that circumstance resulted from SSA's past general acquiescence policy and whether the policy now in place sufficiently guards against non-acquiescence in the future.

#### a. The Original Acquiescence Policy (prior to June 1985)

Prior to June 1985, SSA's practice was to:

follow the holdings by U.S. Circuit Courts of Appeals in the individual case decided, but not to routinely apply (or 'acquiesce' to) Circuit Court decisions which differed from agency claims when adjudicating future claims for benefits.

PX 19. POMS 03106.050 instructed adjudicators not to "apply a court decision in one case to other cases" unless SSA issued revised instructions adopting the decision as policy to be applied in other cases. PX 16. While the OHA Handbook did instruct ALJs to "make every reasonable effort to

follow the district or circuit court's views regarding procedural or evidentiary matters when handling similar cases in that particular district or circuit,"[28] PX 6 at § 1–161, SSA admittedly non-acquiesced in court of appeals decisions either by promulgating SSRs which directed agency adjudicators not to apply a court of appeals decision[29] or "more often" by ignoring the decision and leaving the agency policy intact. PX 23 at 1–2.

Until 1984, Second Circuit decisions not incorporated in SSRs were not circulated to any adjudicators in New York, and when SSA began to circulate some decisions in 1984, they were not given to quality assurance personnel and state agency adjudicators. PX 21 at 8–12.[30] While SSRs and SSA regulations included some aspects of some Second Circuit holdings, no Second Circuit case concerning disability had been incorporated in an SSR; court of appeals cases were generally not used by SSA officials conducting quality assurance reviews; and adjudicators were expressly told not to apply any court holdings not already part of agency policy in reaching their decisions. Of the 117 Court decisions adopted as SSRs between 1975 to June 1989, only six overturned SSA, and only one of these was a Second Circuit decision. PX 4.[31]

With respect to SSA's original policy of non-acquiescence, this Court concluded in *Stieberger,* 615 F.Supp. at 1367, that:

In its persistent refusal to abide by authoritative interpretations of the very statute which it is charged with administering, the SSA has created a litigation burden of unprecedented proportions on the courts, litigants and administrative agency personnel, resulting in the need-

---

**28.** The OHA Handbook also provided that:

[w]here a district or circuit courts [sic] decision contains interpretations of the law, regulations, or rulings which are inconsistent with the Secretary's interpretations, the ALJs should not consider such decisions binding on future cases simply because the case is not appealed.

PX 6 at § 1–161.

**29.** Prior to 1985, only 10 such SSRs had been issued. PX 23 at 1.

**30.** The preliminary injunction issued pursuant to this Court's decision in *Stieberger* directed the SSA to send copies of all Second Circuit decisions regarding disability benefits to all adjudicators. 615 F.Supp. at 1399–1401. After the preliminary injunction was vacated, SSA stopped distributing Second Circuit decisions to state adjudicators. PX 21 at 6–8.

**31.** *See* SSR 84–2c (*Hollman v. HHS,* 696 F.2d 13 (2d Cir.1982) (self-employment income—correction of earnings record after expiration of time limitation)).

less expenditure of resources on the determination, judicial review of, and frequent redetermination (after remand) of disability claims. It has caused needless delays in compensating claimants who are forced to endure the multi-layered administrative process before obtaining the benefits which courts have said are their entitlement and, undoubtedly, the outright denial of benefits for other claimants who are unable or otherwise fail to pursue their claims to the courts. It has frustrated congressional intent, by virtue of the agency's persistent failure to apply the law in accordance with this intent as interpreted by the federal appellate courts in accordance with [*Marbury v. Madison,* 5 U.S. 137, 2 L.Ed. 60 (1803)]. It even has placed its own ALJs in the untenable position of 'trying to serve two masters' ... the courts, who interpret the Constitution and law which ALJs have sworn to uphold; and the Secretary, who has essentially instructed ALJs that they may disregard such interpretations in favor of her own. That these consequences reflect a serious departure from any reasonable conception of an orderly system of justice simply cannot be gainsaid.

(footnotes and citations omitted). Defendants have presented no evidence which suggests that their policy was different from the policy upon which this Court based its earlier conclusion.

b. The Adoption of Interim Circular 185 (June 1985–December 1985)

On June 3, 1985, shortly after Magistrate Buchwald's report to this Court recommending that preliminary injunctive relief be granted, defendants announced a new policy concerning acquiescence. The new policy, contained in Interim Circular 185 ("IC 185"), provided that when a court of appeals issued a decision which was "at variance with established SSA policy," SSA was to issue an AR providing "a full description of the case and an explanation of how SSA will apply the decision within the circuit." PX 38 at 2. The ARs were to be applied only at the ALJ and the Appeals Council levels, not by any of the state level

adjudicators. *Id.* ALJs were to begin to address the court of appeals decisions only after the AR was published. *Id.* By implication, when an AR was not issued and for all determinations at the state level, adjudicators were to disregard court of appeals decisions entirely and apply only agency policy.

Under IC 185, if application of SSA policy and court of appeals holdings as interpreted in ARs yielded different results but the ALJ was prepared to grant benefits under SSA policy, the ALJ did not have to consider the AR. *Id.* at 4. If an ALJ was prepared to deny benefits under both SSA policy and under the AR, his "decisional rationale" was to contain an "evaluation of the evidence addressing both established SSA policy and [the AR]." *Id.* An ALJ prepared to grant benefits under the AR but deny them under SSA policy was required to prepare a "recommended favorable decision" analyzing the claim under both standards. *Id.* at 4–5.

At the Appeals Council level, if the ALJ had decided in favor of the claimant under SSA policy but the Appeals Council believed that the claimant was not entitled to benefits under SSA policy, the Appeals Council had to consider whether a favorable decision could have been reached under the AR. If such a decision could have been reached, own motion review did not have to be taken and the ALJ's decision would become final. If the outcome under the AR was unclear, the Appeals Council was to remand for a hearing and/or recommended decision. *Id.* at 5–6.

If the ALJ had denied benefits under both SSA policy and the AR, if the claimant had requested review of the ALJ's decision, and if the Appeals Council believed that the decision under the AR standard "may [have been] incorrect," the request for review was to be granted. If the Appeals Council then determined that a court "might [have been] expected" to decide against SSA, it was to grant benefits. If the Appeals Council believed that the case needed to be developed further, it was to remand. If the Appeals Council believed the issue should be relitigated, it was to

follow the procedures described in the next paragraph. *Id.* at 6–7.

If the ALJ had stated that he would deny benefits under SSA policy but grant them under the AR, the Appeals Council was to review the ALJ's recommended decision. If the Appeals Council disagreed with the ALJ's interpretation of court of appeals decisions as described in the AR, it was to either issue a revised, unfavorable decision or remand for further development. If the Appeals Council agreed with the ALJ's findings under the AR, it was "ordinarily" to adopt the ALJ's recommended decision. However, when the Appeals Council agreed with the ALJ's conclusion that a favorable decision was warranted under the AR and that application of SSA policy would lead to an unfavorable decision but also believed that the issue involved should be relitigated in that particular circuit, the Appeals Council was to prepare a draft decision unfavorable to the claimant which was to be forwarded to the SSA Special Policy Review Committee. If the Committee determined that the case was an appropriate vehicle for relitigating the issue, the Office of the General Counsel was to consult with the Department of Justice to determine whether relitigation of the issue was appropriate. If relitigation was determined to be appropriate in that case, the ALJ's recommended decision unfavorable to the claimant was to be adopted. *Id.* at 7–8.

In *Stieberger* we expressed "serious reservations concerning the validity" of the policy expressed in IC 185. 615 F.Supp. at 1369–74. First, we noted that because the policy outlined in IC 185 did not apply to state agencies, "only those claimants who persevere[d] to the federal administrative agency level [would] even have an opportunity to receive a disability determination in accordance with congressional standards as interpreted by federal appellate courts." *Id.* at 1369.

Second, we found that "the extent to which th[e] policy eliminat[ed] the burdens and inequities of the Secretary's previous policy [was] questionable." *Id.* at 1372. Specifically, we found that the Appeals Council explicitly reserved the right to ex-

ercise its own motion review power to reverse the ALJ's granting of benefits and did not explicitly reserve the right to reverse an erroneous denial of benefits. We also observed that for SSA to even consider acquiescing in court of appeals decisions, the claimant would have to appeal the unfavorable determination to the ALJ level, the ALJ would have to deny benefits under both SSA policy and the AR or issue a recommended decision granting benefits under the AR, the claimant would have to appeal an ALJ's unfavorable decision, the Appeals Council would have to conclude that the ALJ's decision denying benefits under the standards outlined in the AR was in fact erroneous or find that the ALJ's decision to grant benefits under the AR was clearly correct, and the Appeals Council would have to decide that further development of the case law by the ALJ was unnecessary and that judicial reversal of any unfavorable determination was likely to occur if the claimant sought judicial review.

Even if all these events came to pass, which seemed especially unlikely in the case of pro se claimants with limited resources, we believed that the delay for claimants in receiving benefits was likely to have been substantial. It was apparent that claimants who received a favorable recommended decision from an ALJ would not have been provided with interim benefits. Moreover, we noted that having SSA adjudicators evaluate testimony and weigh evidence in accordance with two sets of guiding legal principles "certainly could not be expected to improve the quality, accuracy or efficiency of the already overburdened decision-making process." *Id.* at 1373.

Finally, we expressed our concern that the standards under which SSA would expressly non-acquiesce lacked clarity. Under IC 185, the Appeals Council reserved the right to non-acquiesce when "appropriate," PX 38 at 8, a determination apparently based on SSA's own evaluation of its chances for success on an appeal. We found that this policy "admit[ted] of no objectively ascertainable limitation on non-acquiescence to those situations in which

such a policy might be appropriate," such as where Supreme Court review would be sought or where other circuits had ruled in SSA's favor subsequent to that particular circuit's unfavorable decision. 615 F.Supp. at 1373. Thus, we found it was "still quite likely that claimants [would] continue to have their disability claims evaluated in accordance with SSA policy rather than conflicting Circuit Court precedents despite the absence of circumstances which justify this practice." *Id.* at 1373.

### c. Transmittal X–7 (December 1985– )

On December 19, 1985, several weeks before oral argument before the Court of Appeals in *Stieberger*, SSA issued Transmittal X–7. Transmittal X–7 provided that an AR issued pursuant to a court of appeals decision would apply at all administrative levels, state as well as federal, if either:

(a) No prompt relitigation of the policy at issue will be sought in the relevant circuit *and* application of the acquiescence ruling at all levels would be feasible (i.e. would not result in administrative inefficiency); feasible; *and* application at all administrative levels would not have an unacceptably adverse effect on Social Security programs or disadvantage individuals already on the Social Security benefit rolls; or

(b) A regulatory change to conform national policy to a circuit court ruling is being pursued and there is little doubt of its ultimate publication.

PX 88 at 4 (emphasis in original). Under Transmittal X–7, when an AR applies to all administrative levels, the various procedures that ALJs and the Appeals Council were instructed to follow under IC 185 do not apply, and the state or federal adjudicator is directed to "issue an initial decision ... in the same manner as if an Acqui-

escence Ruling were not involved in the claim." PX 39 at 6.

When an AR does not apply at all levels, the procedures outlined in IC 185 remain applicable. *Id.* at 3–6. SSA evidently rejected a recommendation to notify claimants denied benefits at the state level that they would be entitled to have holdings of the courts of appeal applied to their claims at the federal level. PX 20. This proposal was rejected, at least in part, because SSA believed that:

> if people are informed that appealing may result in an allowance, the number of individuals pursuing their claims will increase resulting in increased cost. We believe that OMB did not express more serious reservations regarding the implementation of the acquiescence policy than they did because of the lack of significant costs associated with it.

PX 20.

Notwithstanding the uncertainty imparted by the terms "feasible" and "administrative inefficiency" and "unacceptably adverse" in the standard for when ARs will apply at all administrative levels, Transmittal X–7 clearly attempts to address this Court's concern that only claimants who persevered to the federal administrative agency level would benefit by IC 185. Nevertheless, at least where the AR does not apply at both the state and federal levels,[32] the burdens and inequities associated with the multi-step process outlined in IC 185, as well as the Court's concerns about the standards under which SSA would expressly non-acquiesce, are still present.

More significantly, the validity of the procedures outlined in both IC 185 and Transmittal X–7 turns largely on the nature of the criteria used by SSA for deciding when to issue an AR in response to a court of appeals decision.[33] If SSA decides

---

**32.** The Court takes note of the fact that virtually all ARs issued to date by SSA have apparently been applicable at all administrative levels. Defendants' 3(g) Statement ¶ 183.

**33.** In *Stieberger* plaintiffs argued that SSA's revised policy, "premised as it is on agency acquiescence in circuit court decisions 'as interpreted

by the agency,' is simply a procedural variation of the SSA's previous non-acquiescence policy." 615 F.Supp. at 1374. We concluded that:

> [a]t this stage of the proceedings, this Court assumes—recognizing plaintiffs' vigorous assertion that this assumption is ill-founded— that the defendants will interpret circuit court precedents reasonably and in good faith.

not to issue an AR, none of the procedures outlined in IC 185 or Transmittal X–7 are applicable, and the adjudicator is expected to apply SSA policy without even considering court of appeals decisions. Our focus then must turn to the manner in which SSA has implemented its acquiescence procedures.

### d. The Implementation of Interim Circular 185 and Transmittal X–7

Plaintiffs contend that in practice SSA applies a "square conflict requirement" in the AR process, declining to issue rulings for precedent that is not "flatly inconsistent" with agency policy. Plaintiffs' Reply Memorandum at 56. In addition, plaintiffs contend that SSA has treated any court of appeals decision applying "substantial evidence review" as nonprecedential, construed IC 185 as inapplicable to court of appeals decisions involving procedural rules, subjugated the acquiescence process to SSA's litigation interests, and delayed issuing ARs for long periods of time. Plaintiffs' Memorandum at 55.

In order to implement the policy contained in IC 185, SSA created the Acquiescence Task Force in July 1985, with the "mandate and purpose" of "review[ing] Circuit Court law and … prepar[ing] Rulings of Acquiescence in those situations in which the Circuit Court law is in conflict with Social Security policy." PX 91 at 6. Initially the Task Force had a staff of twelve, which was subsequently reduced to four in September 1985 and later to just two. The Task Force was eventually terminated in 1987 and its responsibilities turned over to SSA's litigation staff.

According to Jean Hall Hinckley, a Director of the Task Force, it became the Task Force's practice to prepare for each legal issue either a draft AR, a decision that no ruling was needed, or a memorandum to file for cases read but not raising relevant issues. Hinckley Dep. I at 28–29. After the Task Force finished reviewing the backlog of cases in September 1985, it

ceased preparing a document for each case and instead wrote decisions that no ruling was needed only for the very few cases which involved "significant" issues. *Id.* at 31 & 45. Draft ARs were circulated for comment to different SSA offices, including the OHA, and the Offices of Policy and of the General Counsel,[34] and the draft rulings were modified in response to comments from these offices. *Id.* at 39. Revised drafts were then sent to each of those SSA offices again for comment and to the SSA Commissioner for approval and signature. *Id.* Finally, the drafts were forwarded to the Department of Justice for review before publication. *Id.*

Decisions not to issue rulings were also circulated to different SSA offices, but no responses were required, and after December 1985, they were not approved by the SSA Commissioner. *Id.* at 45–46. These decisions not to issue rulings apparently could be particular to a single case or a small number of cases. Decisions not to issue rulings were prepared for a number of Second Circuit disability decisions, including *Ferraris v. Heckler*, 728 F.2d 582 (2d Cir.1984) and *Carroll v. Secretary of HHS*, 705 F.2d 638 (2d Cir.1983), PX 43, but were not published, distributed to adjudicators, or considered statements of SSA policy. Hinckley Dep. I at 89–92.

In fact, SSA explicitly rejected a proposal to publish decisions not to issue rulings and to distribute them to ALJs, PX 46 at 2–3, based on an assessment of the advantages and disadvantages of such action. The perceived disadvantages included:

> [t]he significant number of nonruling memo cases in which SSA's adjudicators did not follow what the memo asserts is SSA policy may raise questions as to what truly constitutes "SSA policy"— written instructions in an SSA document of questionable legal effect, such as the POMS, or the actual tests applied by SSA's adjudicators and the Secretary in "live" cases presented for decision. The

*Id.* With the benefit of the expanded record of undisputed facts before the Court, this assumption can now be tested.

34. Hinckley indicated that if the General Counsel's Office found a reason not to issue the ruling, the Task Force "would not have pursued it." Hinckley Dep. I at 40.

publication of these memos demonstrating the discrepancies between "official" and "applied" policy may thus:

(1) reinforce critics' belief that SSA is following an unwritten policy, "secret agenda," etc.;

(2) discredit the Acquiescence ruling effort by creating the appearance of a "whitewash," i.e., the repeated claim of no real conflict between SSA and the court despite the obvious facts that the conflict was litigated to the circuit court level and produced a court decision rejecting the Secretary's arguments and reversing her decision; and

(3) potentially provide evidence for class actions seeking writs of mandamus to compel the Secretary to follow the policies she has adopted.

PX 47 at 3–4. A background paper dated August 30, 1985 for a meeting of SSA's Policy Review Committee also addressed the advantages and disadvantages of publishing decisions not to issue rulings, finding among the disadvantages that:

dissemination [of nonrulings] provides adversaries with issues to pursue in further litigation, raises questions of why SSA denied cases and defended those denials in court if the adverse court rulings comport with our policy, and might be used to contest the manner in which SSA policy was applied in other cases.

PX 48. At the same time, however, decisions not to issue rulings were circulated to SSA's regional attorneys to enable them to argue "that SSA's decision not to issue a ruling is of significance and is entitled to deference by the courts." PX 49 at 1–2. The regional attorneys were also instructed by the Office of General Counsel to share the decisions not to issue rulings with United States Attorneys "to defend a particular case should an allegation of nonacquiescence arise on a given issue . . ." Id. at 2.

According to the Director of the Litigation Staff, Karen Wilson, when the Task Force's functions were transferred to the Litigation Staff in early 1987, the Staff continued to apply the same basic procedures and standards as the Task Force. Wilson Dep. II at 197–98. Between February and August 1987, the Staff reviewed approximately fifty court of appeals decisions reversing or remanding denials of benefits, but drafted only about seven rulings and two memoranda that rulings were not necessary. Id. at 208–09. Wilson explains that the Staff drafted memoranda that no ruling was necessary only when a case raised "a significant issue when rational people might disagree about whether a ruling would be necessary." Id. at 204–06.

As of June 1989, SSA had issued 37 ARs. PX 4. None of these ARs dealt with any of the topics within the scope of the Second Circuit holdings discussed in this decision. In fact, only 3 ARs were issued regarding Second Circuit decisions, and none of the four cases discussed involved disability issues. See AR 86–16(2) (Damon v. Secretary of HEW, 557 F.2d 31 (2d Cir.1977) (support of child adopted after worker's entitlement to benefits)); AR 86–21(2) (Adams v. Weinberger, 521 F.2d 656 (2d Cir.1975) (contributions to support re: posthumous illegitimate child)); AR 86–2(2) (Rosenberg v. Richardson, 538 F.2d 487 (2d Cir.1976) & Capitano v. Secretary of HHS, 732 F.2d 1066 (2d Cir.1984) (entitlement of deceased widow when legal widow is entitled on the same earning record)).

Where SSA has no policy with respect to an issue addressed by a court of appeals decision or where a court of appeals holding is more specific than SSA policy, the agency will not issue an AR for that decision under the assumption that "no conflict could exist." Defendants' 3(g) Statement ¶ 225. See Wilson Dep. II at 203 (draft AR when holding is "inconsistent with social security policy"); Hinckley Dep. I at 29 (AR needed only when "there was a conflict between the social security policy and the decision by the circuit court"). This practice fails to take into account the cases where the court of appeals holding, while not inconsistent with existing SSA policy, still has substantial differences which will influence the agency's adjudication of individual cases. See supra pp. 729 – 30.

Moreover, SSA's practice of effectively requiring that a court decision nullify en-

tirely an existing agency policy in order to be considered for an AR does not take into account the judicial practice of consciously avoiding holdings more intrusive than is necessary. That the Second Circuit chooses not to strike down a regulation in its entirety in reversing an SSA decision does not always mean simply that the regulation is valid as written but is not being implemented correctly. For example, the Court's holding may give a regulation a very narrow construction which itself must be codified as policy or may concern matters wholly unrelated to any existing agency policy. Since SSA does not require its adjudicators to follow Second Circuit decisions for which it does not issue an AR, and since memoranda explaining how court of appeals decisions are "consistent with" agency policy are rarely drafted and never made available to adjudicators or published,[35] these Second Circuit holdings will not be applied by SSA adjudicators.

SSA's failure to issue ARs for the Second Circuit decisions concerning an ALJ's consideration of his own personal observations illustrates how the agency's general practice of not issuing ARs for decisions which, though not contradicting agency policy, are still substantially different in a number of respects can lead to non-acquiescence. See supra pp. 740–42. At the time the Task Force considered issuing an AR for Carroll, DeLeon, and Rivera, SSA policy sanctioned ALJ consideration of observations by lay persons and required that ALJs look fully into the issues of a case and give reasons for their decisions. PX 126 at 14–15. In comparing this policy to the Second Circuit's holdings that an ALJ may accord his personal observations of the claimant's physical and mental condition only limited weight in deciding the substantive issues in the case, one could conclude that SSA policy either wholly failed to address the concerns of the Second Circuit or was a great deal more general. However, one could not validly conclude, as the Task Force evidently did, see id. at 15, that even without issuing an AR

SSA would be acquiescing in the Second Circuit's decisions.

In practice, SSA has not issued ARs for most, if not all, decisions assigning more weight to certain evidence or types of evidence, considering such decisions mere disagreements about "facts." See Hinckley Dep. I at 64–67 (where a court of appeals simply puts "more emphasis on something" than SSA, agency was just not "read[ing] the facts the same way"). In many such decisions, the court of appeals applied the traditional "substantial evidence" test, concluding that there was not substantial evidence to support SSA's decision. See Decision that [AR] not needed for Harris v. Heckler, 756 F.2d 431 (1985); PX 59 ("reweighing of the record evidence by the court in the substantial evidence analysis is by nature so heavily dependent upon the particular factual evidence presented as to be incapable of generalization and unsuitable for consideration in the ruling context").

It should be noted first that SSA's practice with regard to decisions based upon the weight assigned certain evidence totally disregards the methods by which precedent is supposed to be interpreted by an adjudicator bound by the decisions of a higher court. Such an adjudicator must apply even decisions turning entirely on facts, deciding like cases alike and analogizing one fact pattern to another. To dismiss cases where the court of appeals has emphasized different facts as unworthy of an AR is to remove an entire and critical body of court of appeals precedent from the consideration of SSA adjudicators. Moreover, SSA's practice in effect second guesses the Second Circuit's own determination that a decision has precedential value, for the Second Circuit does not publish decisions which it does not want cited as precedents. See Second Circuit Rule 0.23. If the Second Circuit intended to limit the holding in a case to the facts of that case, the decision itself would so indicate.

---

35. Not surprisingly, a quick survey of these memoranda indicates that these explanations have often been quite complicated, pulling together material from disparate and scattered sources of agency policy. See PX 43 & 126.

Even if we were to conclude that it is unrealistic to expect SSA's adjudicators to function like any other adjudicator bound to apply the decisions of a higher court,[36] the agency's practice of disregarding decisions which establish the weight to be assigned a whole category of evidence could still lead to non-acquiescence. For example, the Second Circuit's holdings in *Rivera* and *Singletary* to the effect that a claimant with a good work record is entitled to substantial credibility when claiming inability to work because of a disability were reached in the context of substantial evidence review. SSA issued an AR for neither case, and this Court has determined that the agency's failure to apply the holdings constituted non-acquiescence. *See supra* p. 742. With this in mind, the Court finds particularly ominous the view expressed by SSA's Litigation Management Project that "most disability cases decided in Federal courts have little value as precedents for SSA decisions [because they] rest on the lack of substantial evidence for the decisions." PX 24.[37]

SSA has also entirely excluded court of appeals decisions regarding procedural rules from the scope of IC 185 and Transmittal X–7.[38] A memorandum dated September 16, 1985 from the Task Force to OHA and the Office of the General Counsel stated:

the acquiescence ruling contemplated by Interim Circular 185 seems unsuited to decisions involving procedural matters ... Where the disagreement concerns a matter of procedure ... such as the propriety of permitting post-hearing evidence, the ALJ must choose between procedural options during the conduct of case development and must subsequently render his substantive decision on the

basis of the evidence as developed under the selected option. As a result, no recommended decision setting forth alternatives would be possible. We do not believe, therefore, that an acquiescence ruling pursuant to Interim Circular 185 is an appropriate vehicle through which to address this conflict concerning a purely procedural matter.

PX 65 at 2. In a reply memorandum, the Associate Commissioner of OHA concurred in the Task Force's conclusion. PX 66 at 1. Although defendants contend that SSA was "seeking a mechanism to respond to the court rulings on procedural issues even though it did not think acquiescence rulings were appropriate to do so," Defendants' 3(g) Statement ¶ 229–231, nowhere do they suggest what this alternative mechanism might be. The Court has already determined that the general instruction in the OHA Handbook for adjudicators to "make every reasonable effort to follow the district or circuit court's views regarding procedural or evidentiary matters," which existed long before this litigation commenced, could not harmonize SSA policy with all holdings of courts of appeal on procedural or evidentiary matters. *See supra* pp. 738–39.

It is apparent that SSA's practice of not issuing ARs for court of appeals decisions regarding procedural rules has resulted in non-acquiescence and could continue to do so. For example, neither *Gullo* nor *Townley*, the Second Circuit's decisions holding that the agency could not base a disability decision upon a report obtained after a hearing before an ALJ unless the claimant was given an opportunity to cross-examine the authors of the report, was incorporated into an AR because of the agency's prac-

---

**36.** This contention is at least partially undermined by SSA's own quality assurance process which uses case examples to demonstrate how to evaluate a case. PX 8 at 1.

**37.** Moreover, even if this Court accepted arguendo defendants' argument that substantial evidence cases should not be considered precedential as a general matter, SSA itself has suggested that the Second Circuit sometimes applies what could be considered a different substantial evidence standard. PX 28 at 2. Thus,

SSA would still have to explain its decision not to issue an SSR regarding the substantial evidence standard.

**38.** Defendants point out that at least one AR has been issued concerning a procedural requirement, *see* DX 10 (ruling regarding 11th Circuit case concerning the standards for reopening cases at the Appeals Council level), but do not suggest that the Court should infer from this that there has been a change in SSA's acquiescence policy with regard to procedural rules.

tice with regard to procedural rules. PX 68. Therefore, despite the Task Force's finding of a conflict between the holdings in those cases and SSA policy, *id*, the holdings never became SSA policy. The Court has determined that SSA's failure to apply this holding constituted non-acquiescence. *See supra* pp. 738–40.

When SSA has decided to issue an AR, the actual issuance of the ruling has often been delayed by the elaborate process through which such rulings are prepared. *See supra* p. 751. Indeed, Jean Hinckley, the director of the Task Force, testified that no timetables existed for the drafting, approval, and issuance of rulings. Hinckley Dep. I at 88. ARs are rarely if ever issued less than eight months after a decision, and often take considerably more than a year to prepare. Plaintiffs' and Defendants' 3(g) Statements ¶ 296 & 297. Since ARs became effective only after they were issued and since claimants denied benefits during that period never became entitled to benefit from the AR,[39] Hinckley Dep. I at 84, SSA was clearly not acquiescing during this relative long period between issuance of the court of appeals decision and issuance of the AR. Evidently, no effort was made to contact claimants denied benefits during that period.

### e. Measures Taken Since Transmittal X–7

The memorandum dated June 17, 1986 from the Associate Commissioner of OHA (*see supra* pp. 740, 742, note 24, 745, 746) identified "several areas where SSA policy [did] *not* conflict with a circuit court's decision, but that policy (in the Court's opinion) has not been properly applied." PX 51 (emphasis in original). The memorandum included descriptions of "court preferences" and "highlights" from the Task Force's reports "summarizing those areas [of SSA policy] where correct implementation of SSA policy could avoid or reduce court remands and reversals." *Id.* The memorandum was not circulated to state

adjudicators or SSA's quality assurance personnel, did not even address a number of the holdings which this Court has determined that SSA adjudicators routinely failed to apply, described others inaccurately, was not incorporated into the OHA Handbook or issued as an AR, and did not instruct adjudicators to apply court of appeals holdings.

For the reasons discussed above, (*see supra* pp. 740, 741–42, note 24, 745) the June 17, 1986 memorandum did not redress SSA's non-acquiescence in certain specific holdings of the Second Circuit in disability cases. The memorandum also failed to remedy the shortcomings in agency's general acquiescence policy. The memorandum did not purport to be part of a general practice of informing adjudicators of how court decisions were "consistent" with SSA policy,[40] and did not explain how it fit into the scheme envisioned in IC 185 and Transmittal X–7 for identifying differences between court of appeals law and SSA policy and informing adjudicators of them. Regulations issued well after the date of this memorandum make it clear that the standing instructions for adjudicators to apply Second Circuit law only through ARs were not superseded by the memorandum. *See infra* p. 757. Thus, the memorandum could do nothing to redress any of the problems associated with the implementation of IC 185 and Transmittal X–7. In December 1987, SSA's Office of Policies and Procedures could still conclude that:

> A policy which directs attention to judicial guidance in decision making might do much to reduce the volume of court remands because it would require that OHA adjudicators address problem areas while claims are still before the agency.

PX 3 at 20.

A May 25, 1988 memorandum from the Associate Commissioner of OHA stated:

---

**39.** This practice has since been changed. *See infra* pp. 757–58.

**40.** Subsequent to the issuance of the June 17, 1986 memorandum, a proposal to issue to adju-

dicators a circular to explain agency policy in areas where courts often found error was rejected by SSA. Hinckley Dep. II at 19–24.

Improving the legal sufficiency of our decisions also requires that we keep in mind significant circuit court law and court trends which effect the decision-making process. As the Chief Judge stated in his memorandum, we must respond to the courts not only by inclusion of specific language in our decisions as some Courts require, but also, by demonstrating that we have applied the law to the facts of the case before us.

PX 54.[41] This paragraph on its face comes very close to instructing adjudicators that they are bound by decisions of the courts of appeal. Though the emphasis placed on the need for "demonstrating" that SSA has applied the Second Circuit's holdings rather than the need to actually apply those holdings could suggest to an adjudicator he should apply the holdings only to the extent necessary to avoid reversal and not affirmatively in reaching a decision, the memorandum also indicates that SSA is properly concerned with prevailing before courts.

If the Court could conclude that the May 25, 1988 memorandum was actually a statement of SSA's policy and superseded the practice associated with IC 185 and Transmittal X–7 of only permitting adjudicators to apply court of appeals decisions through ARs, it would be strong evidence that SSA's policy now sufficiently protected against non-acquiescence. However, like the June 17, 1986 memorandum, the May 25, 1988 memorandum does not appear on its face to be a statement of general acquiescence policy, was not circulated to state level adjudicators, and was not incorporated into the OHA Handbook, an AR, or SSA regulations. Any uncertainty about the nature of SSA's general acquiescence policy is resolved by the recent amendments to SSA regulations which reaffirm the practice associated with IC 185 and Transmittal X–7. *See supra* p. 757.

In October 1988, OHA commenced distribution of a "Circuit Court Case Reporter," described as "a compilation of Court law on specific issues of interest to OHA adjudicators" and "a quarterly issuance intended to serve as an unofficial informational guide to current developments." PX 21 at 14. The introduction advises OHA adjudicators that:

> The Reporter is an important tool for enhancing the defensibility of [agency] decisions. It provides a brief insight into how courts interpret the basic policy contained in the law, regulations and rulings and into what the courts consider to be necessary ingredients for a well reasoned decision. A well articulated decision with good rationales will improve the Secretary's litigation posture in the Federal courts.

PX 55. SSA does not contend that it requires adjudicators to apply the law described in the Reporter [42] or that all ALJs will do so. The Reporter is also evidently not even provided to state adjudicators. Once again, the emphasis in the introduction to the Reporter upon the "defensibility" of decisions—rather than to the decision-making process itself—is a cause for some concern. More significantly, as with the memoranda discussed above, SSA did not clearly indicate how the Reporter was to be used in conjunction with the practices decreed by IC 185 and Transmittal X–7.

The April 14, 1989 memorandum from the Associate Commissioner of OHA (*see supra* p. 746) provided:

> In an effort to improve the legal sufficiency of our decisions, we have reviewed the circuit court decisions to identify recurring issues which are of particular concern in each circuit ... [and] have identified the leading decisions in each circuit on the issues most frequently

*Id.*

---

**41.** The May 1988 memorandum also notes that:
Currently, [SSA has] in place no regular mechanism to keep you apprised of the rules of the Circuits and developing trends in the District and Circuit courts so that we can take "preventive" action. (I expect to have such tools in place by the beginning of Fiscal Year 1989).

**42.** Defendants contest this assertion in their 3(g) Statement ¶ 282, citing to a portion of their brief which argues only that "SSA has stressed the importance of court decisions" to its adjudicators. *See* Defendants' Memorandum at 13.

raised in cases remanded or reversed on judicial review. Although these decisions do not, of course, cover the full range of circuit law related to Social Security adjudication, they do represent those which recent experience shows require special attention. I believe that we will enhance the legal sufficiency and quality of our decisions if we use the law as cited in these decisions as part of the decisional rationale on the stated issue.

Accordingly, the decision writer in the field and in headquarters must ensure that he or she has properly handled those issues which have been significant to the circuit court on appeal. If the case you are evaluating contains one of the issues shown for that circuit, please refer to the attached list of SSR and circuit court case citations.

DX 31. A list of citations was attached. This memorandum again comes extremely close to instructing adjudicators that they are bound by decisions of the courts of appeal, but suffers from precisely the same infirmities as the May 25, 1988 memorandum.

SSA provides Continuing Legal Education efforts which apparently explain how:

> to write administrative decisions that apply (not just quote or cite) appropriate statutory provisions, regulations, Social Security Rulings, acquiescence rulings, and circuit court case law to the facts of a particular case. One afternoon of the legal writing training was devoted to the discussion and analysis of circuit court case law.

Anderson Declaration ¶ 2. SSA clearly teaches adjudicators how to write decisions with the goal of passing judicial scrutiny. It also seems to instruct them how to apply decisions of courts of appeal to the facts in their cases, but it very carefully avoids explicitly directing them to use such decisions affirmatively in the decision-making process. An adjudicator, after reading SSA policy statements and undergoing

Continuing Legal Education efforts, could well come away with the impression that the goal of writing decisions is just to avoid reversal, not to apply the full breadth of court of appeals holdings. More significantly, the instruction to apply only those court of appeals holdings contained in ARs continues to apply—and we note again that no AR has ever been issued with respect to a Second Circuit disability holding.

### f. Recent Amendments (January 1990– )

■ New regulations concerning SSA's acquiescence policy became effective on January 11, 1990, the date of oral argument before this court on these motions. *See* 55 Fed.Reg. 1018–21 (1990) (to be codified at 20 C.F.R. 404, 410, 416 & 422). Though these regulations attempt to address two of the problems identified in our discussion of the implementation of Transmittal X–7 and IC 185, they for the most part simply codify what has been SSA acquiescence policy since IC 185.[43]

Most significantly, the regulations confirm that adjudicators are not to apply holdings of the courts of appeal which differ from SSA policy unless and until an AR is issued. In a series of comments and responses which appear immediately before the regulations themselves, the agency indicates explicitly that it rejected a suggestion that SSA adjudicators be permitted to "consider circuit court holdings without the benefit of an [AR]," finding that it would hinder the agency's efforts to "ensure the uniform and consistent adjudication necessary in the administration of a national program." *Id.* at 1013.

The regulations also reiterate that SSA will issue an AR only when a court of appeals decision and SSA policy "conflict." Specifically, the regulations provide:

> When we determine that a United States Court of Appeals holding conflicts with our interpretation of a provision of the Social Security Act or regulations and

---

**43.** In large measure, these regulations address procedures for suspending ARs when certain "activating events" occur. The Court accepts plaintiffs' suggestion that any determination of

the legality of these procedures await actual decisions by SSA to suspend ARs pursuant to these procedures.

the Government does not seek further review or is unsuccessful on further review, we will issue an [AR] that describes the administrative case and the court decision, identifies the issue[s] involved, and explains how we will apply the holding, including, as necessary, how the holding relates to other decisions within the applicable circuit.

§§ 404.985(b), 410.670c(b), 416.1485(b); *id.* at 1018–20. In response to a comment to the effect that this policy fails to identify "all existing circuit court holdings at variance with [SSA] policy," the agency states:

[i]f a person believes that we have overlooked or misconstrued a holding in a Court of Appeals decision, that person may bring this matter to our attention and we will respond appropriately.

*Id.* at 1012. Keeping in mind that much of the plaintiff class proceeded through the administrative review process pro se and that the regulations provide absolutely no indication of how SSA is prepared to respond to such complaints, the Court finds that the regulations improperly shift the responsibility for guaranteeing SSA's acquiescence away from the agency itself.

This same response also indicates that when court of appeals formulations "differ in wording" from SSA policy but are "not inconsistent" with that policy, the agency:

may provide instructions to adjudicators to ensure that [agency] policy is followed correctly or revise our regulations to provide more specific policy guidance on the matter at issue.

*Id.* In no sense can this response be read as a commitment to require adjudicators to comply with court of appeals decisions which differ from SSA policy but do not contradict it.

Finally, the regulations do provide a mechanism for claimants denied benefits after a court of appeals decision but before the issuance of an AR. Specifically, they provide that:

the claimant may request application of the published ruling to the prior determination or decision. The claimant must

first demonstrate that application of the ruling could change the prior determination or decision. A claimant may so demonstrate by submitting a statement which cites the ruling and indicates what finding or statement in the rationale of the prior determination or decision conflicts with the ruling.

§§ 404.985(b), 410.670c(b), 416.1485(b); *id.* at 1018–20. Because this provision attempts to address only one of the several concerns expressed by this Court with regard to SSA's general acquiescence policy, we need not decide whether it successfully alleviates that concern.

### III. *Conclusion and Comments on Remedy*

Defendants' motion for summary judgment on statute of limitations grounds is granted to the extent it relates to those members of the plaintiff class represented by counsel at their last stage of the administrative process who knew or should have known of the facts giving rise to this action. Defendants' motion is denied to the extent that it is directed to those members of the plaintiff class who proceeded through the administrative process pro se or who were represented by counsel who did not know and could not have been expected to know of the facts giving rise to the claims in this action.

The Court finds SSA non-acquiescence with respect to four specific holdings of the United States Court of Appeals for the Second Circuit. In addition to the general treating physician rule as set out in *Schisler II* (pp. 733–37),[44] these include the Court's holdings to the effect that: a disability decision cannot be based upon a report obtained after a hearing before an ALJ if the claimant against whom the report is introduced is not given an opportunity to cross-examine the authors of the report (pp. 738–40); an ALJ may accord his personal observations of the claimant's physical and mental condition only limited weight in deciding the substantive issues in the case (pp. 740–42); and the testimony of a claimant with a good work record

---

**44.** 851 F.2d at 45–46 n. 1.

claiming an inability to work because of a disability is to be deemed substantially credible (pp. 742). Plaintiffs' motion for summary judgment on their non-acquiescence claim is granted to the extent it relates to those particular holdings.

Plaintiffs' motion for summary judgment is denied without prejudice to the extent that it relates to the Second Circuit's holdings that: a finding that the witness is not credible must be set forth with sufficient specificity to permit intelligible plenary review of the record (pp. 742–44); [45] the determination of another government agency that a claimant is disabled, while not binding upon SSA, is entitled to some weight and should be considered (pp. 744–45); and a conclusory opinion by a pro se claimant's treating physician cannot be rejected unless the ALJ informs the claimant of his proposed action and provides an opportunity for the claimant to obtain a more detailed statement (pp. 746–47). Plaintiffs may renew their summary judgment motion with respect to these holdings if they can present evidence establishing that the differences between SSA policy and Second Circuit holdings have influenced the agency's adjudication of cases.

Plaintiffs' motion is denied with prejudice to the extent that it relates to Second Circuit holdings that: opinions of non-examining medical personnel cannot, in themselves, constitute substantial evidence to override the opinion of the treating source (p. 737); a treating physician's medical testimony need not be supported by objective clinical or laboratory evidence (pp. 737–38); the testimony of a relative could be probative of certain issues in the case about which the relative has knowledge (pp. 743–44); ALJs have a duty to fully develop the record for pro se claimants (pp. 745–46); ALJs must inform pro se claimants of their right to subpoena and cross-examine witnesses (p. 746); and an ALJ must inquire into a pro se claimant's previous disability and subjective complaints (p. 746).

Plaintiffs have demonstrated a sufficient threat of continuing injury to be entitled to injunctive relief. In addition to the examples of past non-acquiescence outlined above, the Court has determined that SSA's "acquiescence" policy leaves a great deal of room for non-acquiescence. Just as Judge Elfvin found bases for not applying the treating physician rule "lurking" in SSA's draft SSR, *see supra* p. 733, this Court finds bases for not applying many of the Second Circuit's holdings lurking in the agency's general acquiescence policy.

The Court also cannot ignore the fact that the evolution of SSA's acquiescence policy appears to have been driven in large part by this litigation. Each significant modification of agency policy came shortly before a major stage of this case. *See supra* pp. 748, 749–50, 757. The impact of this litigation is illustrated most dramatically by a January 15, 1986 memorandum from the Acting Commissioner of SSA to the Principal Deputy Undersecretary shortly before oral argument in the Court of Appeals. The memorandum expresses great concern for the "precedent [*Stieberger*] might establish for acquiescence," seeks to use IC 185 to "defuse the issue with the courts," and conveys the Department of Justice's urgent recommendation that SSA issue "one or more Rulings of Acquiescence applicable at all adjudicative levels before the January hearing in *Stieberger*." PX 88 at 1 & 4. Plaintiffs appear justified in their concern that absent the threat of judicial compulsion, SSA's professed interest in acquiescence would wane.

 Insofar as other relief is concerned, plaintiffs have submitted a proposed remedy order which, apart from injunctive relief, would call for the reopening of all cases arising in the Second Circuit subsequent to October 1, 1981 in which disability benefits were denied. Such a remedy proposal has the virtue of sim-

---

**45.** If plaintiffs choose to renew their motion with respect to this particular holding, this issue of whether there are substantial differences be-

tween SSA policy and the holding will have to be revisited. *See supra* p. 743.

plicity but it has several defects. First, it would entail an administrative and fiscal burden the precise magnitude of which the parties may debate but which is undeniably of major proportions. Second, it would be violative of the well accepted rule of law that a court imposed remedy be the minimum necessary to redress the injury. More than this would constitute an unwarranted judicial intrusion on the administrative process.

We have held that non-acquiescence exists and has affected the adjudicatory process for determining eligibility for disability benefits in some, but not all, areas of the law. The question then arises whether a remedy order can be crafted which will address the specific cases in which SSA's non-acquiescence could have adversely affected the decision and which are not time-barred pursuant to the criteria established herein. *See supra* p. 727. This is a matter which counsel have not addressed.[46] Obviously it raises questions concerning the ability to identify such cases and the establishment of screening procedures. Consideration should be given to what techniques —questionnaires, ad hoc review panels, special master proceedings, etc.—can be brought into play to address this problem.

The parties are to submit revised remedial orders conforming to this opinion by June 25, 1990, and the Court will hold a conference to discuss the remedy phase of this case on July 10, 1990 at 4:30 pm.

SO ORDERED.

---

**46.** Fairness to plaintiffs requires us to state that the parties originally sought to defer submission of any remedy proposals until the liability motion was decided. The Court required submission of remedy proposals because of the requirement noted above that remedy be tailored to meet the injury and go no further.